THOMAS B. BARMORE *v.* VICKSBURG, SHREVEPORT AND PACIFIC
RAILWAY COMPANY.

1. MASTER AND SERVANT. *Torts of servant. Scope of employment. Question of law. Question of fact. Evidence.*

   If there be no conflict in the evidence, the question whether a servant whose wrongful act caused injury to a stranger was acting within the scope of his employment, is for the court; but if there be conflict, then the question is for the jury to decide.

2. SAME. *Responsibility of master. Departure from service.*

   In such case it must be shown, in order for the master to escape liability, that the servant, when the wrongful act complained of was committed, had abandoned his employment and gone about some purpose of his own not incident to his employment.

3. SAME. *Railroads. Concrete case.*

   Where an employe of a railroad, whose duty it was to attend to a steam pump, supplying water to a tank, was furnished with a railroad tricycle which he used to gather kindling along the right of way, went to a certain point where it was plentiful, but deviated from his purpose to gather the same after reaching the point, and carried a sick friend on the tricycle therefrom to a station beyond, and while returning, but before reaching the point at which he had taken up his sick friend and deviated from his employment, negligently ran the tricycle against and struck plaintiff, the railroad was liable for his so doing, since the responsibility of the railroad company for his acts attached immediately upon his having accomplished the errand on behalf of his friend and when he started to return to his duty to gather kindling.

4. SAME. *Dangerous instrumentality.*

   A master who intrusts to a servant the custody of an appliance which, by reason of its nature or the method of its operation, is dangerous or liable to inflict serious injury upon others, cannot avoid responsibility for injuries inflicted in the operation thereof on the ground that the servant, in the particular act complained of, was acting outside of the scope of his employment.

5. SAME. *Question for jury.*

   Whether a railroad tricycle, speeding along the track, is a dangerous instrumentality, within the rule holding the master

liable for injuries caused by a servant in the use of a dangerous instrumentality, whether in being where he was on the track he was acting in the scope of his employment or not, is a question for the jury.

6. SAME.  *Railroads.  Liability to trespasser on track.*

A railroad is liable for injuries to a trespasser on its track, notwithstanding his contributory negligence, where they are caused by the gross negligence of its servant, who, with knowledge of the trespasser's perilous situation, wantonly injured him.

FROM the circuit court of Warren county.

HON. GEORGE ANDERSON, Judge.

Barmore, the appellant, was plaintiff, and the railway company, the appellee, defendant in the court below. From a judgment in defendant's favor, the plaintiff appealed to the supreme court. The facts are stated in the opinion of the court, and also in the dissenting opinion of the chief justice.

*Snyder & Gilfoil,* for appellant.

If it be admitted that Watson had no business to propel the tricycle east of Cow Bayou trestle, and that when he passed across it he was engaged on business of his own, to accommodate a sick acquaintance with a ride to Waverly, and that the defendant, having furnished him with this dangerous machine and practically a free track to run it on, is charged with no liability for his misuse of the machine, and the running of his machine beyond his territorial limits, yet the facts that he left his tank for the purpose of procuring kindling for his engine; that he went beyond the place where the kindling lay, with the intention and purpose of gathering the kindling on his return; that he was on his return trip, in the performance of his duty to return the tricycle to the place where it belonged, and in the further performance of his master's business, intending to gather the necessary kindling when he arrived at the place where it was, show conclusively that this employe was, at the time of the injury, in the function to which he had been appointed, engaged

in his master's business, and in the performance of the duties he owed his master.

The position taken by the defendant in the court below, in its last analysis, is simply this: If the injury had been occasioned when Watson was bound east toward the kindling for the purpose of gathering it, the master would be liable; but as he was approaching the kindling from the other side, from the east, although animated with the same purpose of gathering it to fire his master's engine, which was his business, the master cannot be held.

We submit that it is inconceivable that this can be the law. The cases urged by defendant in support of its point of view of non-liability of the master are all based upon facts which show that the act was done while the servant was at liberty from his service and pursuing his own ends exclusively. And the doctrine relied on in cases cited by defendant has been greatly modified.

Where the servant is in the performance of even the slightest duty to the master, the master is held liable. In the case cited in the brief of our associates, and the latest we are able to find on the point, and very much in support of our position, *Weber* v. *Lockman,* 60 L. R. A., 313, the court says: "The boy was a minor, riding his father's horse. It was his duty, after having executed his mission, to return the animal to his father's stables. Whatever negligence there was in departing from the direct route, or in delaying his return until after nightfall, or in the management of the horse at the time of the accident, was committed in performance of this duty and service."

The supreme court of Louisiana in the case of *Dorsey* v. *Railway Co.,* 104 La., 478 (52 L. R. A., 92), the latest expression from that court on this subject, says: "We take it that the rule exempting the master from responsibility is expressed in the following: 'When the employe, in carrying out a purpose of his own, does injury to another, not within the scope of his employment, the employer is not liable.'"

On the proposition that the master is liable for the damage and injury caused by the misuse by his servant of a dangerous instrument, machine, or agency, which it has placed in his hands and over which it has given him exclusive control, the following cases are in point: The case of *Nashville & C. R. Co.* v. *Starnes,* in which the court said: "Railroad corporations only act through agents; and having placed in their hands such deadly instruments, the law demands of them the utmost caution in the selection of agents, and holds them strictly accountable." 9 Heisk. (Tenn.), 52 (19 Am. Ry. Rep., 280).

"Where the servants of a railroad in the discharge of their duties pervert the appliances of the company to wanton and malicious purposes, to the injury of others, the company is liable for such injury." *Chicago, B. & Q. R. R. Co.* v. *Dickson,* 63 Ill., 157 (7 Am. Ry. Rep., 45), following *Toledo W. & W. R. Co.* v. *Harmon,* 47 Ill., 298; *Railroad Co.* v. *Shields,* 44 Am. & Eng. R. Cas., 647 (8 L. R. A., 464); *Alsever* v. *Minneapolis & St. L. Co.,* 56 L. R. A., 748; and in *Euting* v. *Chicago & Northwestern R. Co.,* 60 L. R. A., 158.

*McLaurin, Armistead & Brien,* on same side.

*Weber* v. *Lockman* (Neb.), 60 L. R. A., 313, decided in November, 1902, is in point. This was an action against defendant to recover damages for personal injuries caused by the negligence of defendant's son, acting in the capacity of a servant for his father, for which defendant was alleged to be responsible.

In *Cosgrove* v. *Ogden,* 49 N. Y., 225 (10 Am. St. Rep., 361), it is said: "The test of the master's responsibility for the act of the servant is not whether such act was done according to the instructions of the master to the servant, but whether it was done in the prosecution of the business that the servant was employed by the master to do."

In the case at bar the act was done while the servant was en route to pick up the kindling necessary to start his fires. It

seems to us that he was certainly at the time about his master's business. In the case of *Fitzsimmons* v. *Railroad Co.*, 57 N. W., 127, a case where a railroad engineer violated the express orders of the company and ran his engine from one station to another, it was said he was still acting within the lines of his employment, and plaintiff, the passenger injured by his wrongful conduct, recovered of the defendant company. It will be noted, too, from an examination of the case, that a recovery was had, and based on the ground that the engineer was still in the line of his employment, although conducting the business of his master in violation of his master's orders, and not because of the fact that the party injured was a passenger on another of defendant's trains. Is there any difference in principle between the wrongful operation of a locomotive and the wrongful operation of a tricycle? See also in this connection *Smith* v. *Munch*, 68 N. W., 19.

The general rule of liability of the principal to a third party is the same in Louisiana, the scene of this accident or injury, as it is in Mississippi or other common-law states, Louisiana going further than some of them, however, in adhering to and enforcing the doctrine of "last clear chance." *McClanahan* v. *Railway Co.*, 35 South. Rep., 902.

Watson had been entrusted by appellee with the custody and care of a railroad appliance, a tricycle, which, when properly used, was in itself a dangerous instrument, and for that reason defendant cannot escape liability resulting from the improper handling thereof.

· Whether or not the tricycle was an appliance of such dangerous character in itself as to require the utmost care in its use, and such care that the railroad could not relieve itself of the responsibility of the improper use thereof, because of its nature, by a servant, nevertheless the limits for the use and keeping of the appliance by the servant had been prescribed, and it was the duty of the servant to return said appliance to its present and proper place for keeping or use, and that, too, no matter

where he found it or how it got out of place, and in attempting to so return it the servant was doing his duty to his master, and certainly at the implied bidding of his master.

There is no dispute in the testimony as to the character of Watson's employment. He was a pumpman, and to discharge this service for the company he had been supplied with this tricycle. The limit of the right to use the tricycle was to go to and from his home to the tank, and up and down the track generally to pick up kindling with which he could fire his engine. It was his duty to keep this tricycle, property of the company, at Delhi, his home, when not in his actual use for the purposes mentioned.

Now, let us suppose this case: Suppose that on the morning of the 14th of July, 1903, when he started out to do this work, he had not picked up May Barmore (not plaintiff, but the man carried to Waverly) at the pump, but that he had passed him there, and had gone on to the west end of Cow Bayou to get his chips. Suppose that when he got there he had set his tricycle to the side of the track, and that he had walked, or by some other means been conveyed, to Waverly for purposes of his own. Then suppose that May Barmore had followed along behind on his way to Waverly on foot, and had found this tricycle on the side of the track, and had reset it on the track, and had ridden from there on to Waverly on it, and that Watson had been at the station by accident and saw him arrive and had recognized the tricycle as the one in his use and custody. What then would have been his duty to his employer? The answer, and the only correct answer, naturally follows the asking—that is, of course, to carry it back to where it belonged. His duty to his company would arise then and there instantly. Now we submit, in all confidence, that there is no distinction in principle in the case at bar and the supposed case, as to Watson's duty to his master after the tricycle arrived at Waverly, no matter how it got there. As to who did wrong in taking it there, the answer is wholly immaterial. It was Watson's duty to take the

machine back.   This was his business, and although he had left
his master's business and had detoured on his own, is it not
always implied, is it not always certain, that when an employe
does wrong there is no minimum limit as to when he can repent
and go back to his duty and the service of his master? He does
not have to wait until he can get back to the spot where he first
did wrong before he can repent and return to his master's serv-
ice; if so, he would never get back, unless by chance.   As to
whether the tricycle was a dangerous appliance, the nature of
the piece of machinery must, of course, be considered in connec-
tion with the purpose for which it was built.   The locomotive is
not a dangerous appliance unless it is being used or about to be
used for the purposes for which it was built.   If it had no steam
in it, or if it was not on a railroad track, it would practicably be
immovable and of no danger, but give it steam and put it on a
track, and unless properly handled it is a very dangerous piece of
machinery.   So it is with a tricycle, propelled by the muscle of
the operator rather than by steam.   In both cases the mind of
the operator controls the motive power, and unless properly
controlled the machine is very dangerous.   No distinction can
properly be drawn between the inability of the master to escape
liability from injuries to a third person arising from the want of
proper care, by a servant, of machinery or things dangerous, so
called, within themselves, and machinery dangerous only when
improperly used.   For damages resulting in both instances there
is authority for holding the master liable.   In the first instance
—that is, for things dangerous within themselves—see *Railroad
Co.* v. *Shields,* 47 Ohio St., 387 (21 Am. St. Rep., 840).   In
the second instance, for the improper use of an engine, see
*Fitzsimmons* v. *Railroad Co.,* 57 N. W., 127.

*McWillie & Thompson,* for appellee.

Watson was not serving the railway company in carrying his
sick friend to Waverly.   So doing was a clear departure from
the master's service.   Had the plaintiff been injured while

Watson was on his way to Waverly, he would not, nor would his counsel, contend that the railway company was liable. Is there any difference because of the fact that the injuries complained of were inflicted by Watson on his return trip? If Watson had returned to his master's service and Barmore had been injured by his negligence in the performance of his master's work, the plaintiff would have a cause of action; but this is not true until the servant's return to his master's work is complete. There is a difference between *returned* and *returning*.

It is said by appellant's counsel that Watson owed his master a duty to restore the tricycle, and that he was performing that duty in returning it at the time that plaintiff was injured. This may be true, but it does not follow therefrom that the railway company is liable to plaintiff. Appellant's contention wholly ignores the difference between the performance of a duty by the servant to the master, which springs from the servant's tort, or breach of duty, and one which arises from his employment. In the performance of a duty by the servant to his master arising from his contract of service the servant is performing his master's work; but in the performance of a duty to the master which arises from the servant's own wrong, something not covered by or contemplated in the contract, he is not acting within the scope of his employment. A servant who wrongfully rides his master's horse upon a mission of his own is under the duty to the master to return the horse; this duty, however, does not spring from the contract of service, nor is it contemplated by it, but arises from the servant's wrong. A thief is under a moral and legal duty to restore property stolen by him, but while returning the stolen property he is not the agent or servant of the owner.

Liability of the railway company cannot arise in this case from the fact that Watson was returning the tricycle. If it could, then the railway company would have been liable had Watson been returning by an ordinary dirt road with the tricycle on his shoulder and had injured plaintiff in so doing, or had he been returning the tricycle in a boat and plaintiff had

85 Miss.—28

been injured by his negligence along the water route. Nothing could be more absurd than the claim that the railway company would have been liable for the acts of Watson while returning the tricycle along the ordinary country road or in a boat; and yet these supposed cases demonstrate that liability in this case cannot be predicated of the fact that Watson, at the time plaintiff's injuries were received, was returning the tricycle to the master's service, and this aside from the fact that his duty to return the tricycle had no relation to his contract of service, but sprang wholly from his unauthorized use of the railway company's property.

Can liability be predicated of the fact that in returning Watson propelled the tricycle along the railroad track?

The real question is, whether Watson, in using the railway track on his return, was performing his master's work. He was on his way to the place where he had abandoned his master's work, but had not *returned* to the master's work. Besides, his returning was but the result of his departure. His returning, like his obligation to restore the tricycle to its proper place, sprang from his departure, and did not grow out of his contract of service and was not contemplated by it.

The fallacy of appellant's argument consists in an assumption which is unwarranted. The argument assumes that the acts of Watson, resulting from and attributable to his independent and individual conduct in departing from the service of his master, are to be treated as having origin in and as springing from his contract for service to the railway company. The use of the railway track by Watson on his return trip was just as unwarranted by and as far removed from his contract of service and his duties to his master thereunder as was its use by him in going to Waverly in order to accommodate his sick friend.

The fact, if it be a fact, that it was Watson's intention while returning to his master's work to pursue that work when his return was completed is of no consequence; he had not *returned* to the work at the time of the accident, and what he intended,

while returning, to do after his return throws no light on the point in dispute. He was not in the service of his master at the time the intent attributed to him was in his mind nor when plaintiff received his injuries. What he intended to do after he should have returned to the railway's service is wholly unimportant.

Of course, if liability of the railway company does not arise from the fact that Watson, at the time of the accident, was returning the tricycle nor from the fact that he was using the railway track in so doing, there is no liability whatever. The joint effect of the two facts is no greater than the separate effect of the stronger of the two, whichever of the two that may be.

The case of *Canton Cotton Warehouse Company* v. *Pool*, 78 Miss., 147, the last reported decision of this court on the subject, is, we think, absolutely conclusive of this case. In the opinion of the court in that case, delivered by Chief Justice Whitfield, it is said: "The inquiry is not whether the act in question in any case was done, so far as time is concerned, while the servant is engaged in the master's business, nor as to the mode or manner of doing it—whether in doing the act he uses the appliances of the master—but whether from the nature of the act itself, as actually done, it was an act done in the master's business, or wholly disconnected therefrom, by the servant, not as servant, but as an individual on his own account." In that case, so far as time is concerned, the servants of the warehouse company were in its employment at the time of Pool's mishap; were using the master's machinery, and by that use inflicted injuries on Pool. But the acts performed by them were not acts done in the master's business; they were acts done by the employes, not as servants of their master, but as individuals on their own account. Here, so far as time is concerned, Watson might have been an employe of the railroad company at the time plaintiff was injured; he might have been, and in fact was, using the master's tricycle, and in its use inflicted the injury of which complaint is made. But Watson's acts were not performed in his master's.

business; they were performed by him, not as servant of his master, but as an individual on his own account, and grew out of and had their origin in an undisputed departure from his master's work.

In the Pool case the defendant's servants were fully as much under a duty to their master when they perpetrated the practical joke on the plaintiff, and thereby injured him, as Watson was under a duty to the railroad company when returning from Waverly on the tricycle. They were under a duty to see that the master's machinery was not improperly used, a duty which might with a shadow of reason be said to have arisen from their contract of service; and yet this court was not misled by that fact. It was manifest there that the injuries complained of resulted from the servants' bald departure from the scope of their employment, from a misuse, for purposes of their own, of the master's appliances; and the same controlling fact is manifest in this case.

The whole subject-matter of the master's civil responsibility for the wrongful and negligent acts of his servant towards those having no claim upon the master by reason of a contract is so fully treated in the note to 27 L. R. A., beginning on p. 161, that we deem the mere citation thereof sufficient, but will nevertheless call the court's attention to the following cases digested in said note, which we deem most nearly like the one at bar. These cases are:

*Chicago, B. & Q. R. R. Co.* v. *Epperson,* 27 Ill. App., 79, in which the railroad company was held not to be liable for the acts of its fireman in going into the caboose and getting torpedoes and placing them on the track for the purpose of making a noise to aid in a Fourth of July celebration going on at a station.

*New York, T. & M. R. R. Co.* v. *Sutherland,* 3; Wilson Civ. Cas. (Tex.), 177, in which the railroad company was held not to be liable for the act of the engineer in running the engine on the main track at night for the purpose of carrying a coffin for

the accommodation of a third person, when in so doing he was acting without, or contrary to, the master's orders.

*Raynor* v. *Mitchell,* 2 C. P. Div., 357 (25 Week Rep., 633), in which the servant was held not to have returned to his master's employment so as to render the master liable for injuries caused by his negligent driving. It was the duty of the servant to deliver beer and to bring back empty kegs, and he took the horse and cart for purposes of his own, and after accomplishing his object, he picked up two empty kegs from a customer of his master and took them back with him, and the injuries complained of were inflicted after he took up the kegs.

We also call the court's attention to the following Mississippi cases which we regard as pertinent, and which, it seems to us, demand the affirmance of the judgment from which the appeal is taken:

*New Orleans, etc., R. R. Co.* v. *Harrison,* 48 Miss., 112; *Burke* v. *Shaw,* 59 Miss., 445; *Fairchild* v. *New Orleans, etc., R. R. Co.,* 60 Miss., 931; *Louisville, etc., R. R. Co.* v. *Douglass,* 69 Miss., 723; *Illinois, etc., R. R. Co.* v. *Latham,* 72 Miss., 32; *Canton Cotton Warehouse Co.* v. *Pool,* 78 Miss., 147.

The following Louisiana cases also demand affirmance: *Garver* v. *Viosca,* 8 Rob., 150; *Dyer* v. *Riley,* 28 La. Ann., 6; *Conniff* v. *Railway Co.,* 42 La. Ann., 477; *Odom* v. *Schmidt,* 52 La. Ann., 2129 (s.c., 28 South. Rep., 350).

*Weber* v. *Lockman* (Neb.), 60 L. R. A., 313 (a case cited in both briefs for appellant), is much counted upon, but is easily distinguished from the case at bar. There the servant was engaged in the master's business in driving the cattle and in returning the horse. His departure from the direct route home was a thing of the past at the time of the infliction of the injuries for which the suit was brought; he had returned to the direct route before the accident happened. The case would be applicable here if Watson had been doing the railway company's work in carrying the sick man to Waverly and had departed from and returned to the direct route upon his return before

striking the plaintiff. That is not this case. Watson was upon a personal and individual excursion in going across Cow Bayou and on to Waverly, and had not returned to his master's work when plaintiff was injured.

In *Weber* v. *Lockman,* the duty of returning the horse, as was expressly decided by the court, sprang from the contract of service, and not from the servant's departure from the scope of his duty under that contract.

The cases, cited by opposing counsel, of *Dorsey* v. *Pittsburg, etc., R. R. Co.,* 104 La. Ann., 478 (s.c., 52 L. R. A., 92), and *Williams* v. *Pullman Palace Car Co.,* 40 L. Ann., 87 (s.c., 3 South. Rep., 631), are decidedly favorable to us. In the Dorsey case the injury was inflicted by the brakeman while ejecting a tramp from the train—a duty, as decided by the court, clearly within the scope of his employment. The Williams case was a suit for an assault and battery committed by a Pullman porter upon a railroad passenger who was not a sleeping car passenger. The railroad company was held liable, because as carrier it owed the plaintiff the duty of safe carriage, and the porter was adjudged to be a servant of the railroad company as well as of the sleeping car company. The Pullman company was acquitted from liability because the assault was not committed within the scope of the servant's employment by that company, and that, too, although he was, so far as concerns time, in the employment of the Pullman company when the assault was committed, and was in one of its cars, and perhaps used an implement belonging to the company as a weapon with which to strike plaintiff. We have no complaint to make of the case of *Cosgrove* v. *Ogden,* 49 N. Y., 225 (s.c., 10 Am. St. Rep., 361), cited by counsel, nor with the decision in *Fitzsimmons* v. *Milwaukee, etc., R. R. Co.,* 57 N. W. Rep., 127. The case last cited is not parallel to the case at bar. Had the engineer in that case run his engine upon some other railroad or upon some track that it was never intended to be run upon, there might be some similarity to the present case. There the engine was de-

signed to be run on the track where the injury happened, and it was nothing more than the case of a servant disobeying orders while in the service of his master. The engineer there did not quit the service: here Watson had departed from his master's service. Besides, that case was one in which the railroad company was clearly liable outside of the question of violating orders and departing from service.

*Custody of Dangerous Instruments.*—This brings us to the question of the custody of the tricycle, which appellant's counsel have undertaken to magnify into a dangerous instrument and seek to hold the railway company liable for everything done by Watson with the tricycle because of its dangerous character. This court said in the Pool case, "The ordinary appliances in use in an ice factory cannot be so classed, certainly not a coal scoop and electric lights," meaning that such appliances cannot be classed with such dangerous implements as steam engines, dynamite, torpedoes, etc. Of course a railroad tricycle cannot be so classed. Such tricycles are no more dangerous than hammers, clubs, axes, hatchets, etc.

If the court takes judicial notice of what railroad tricycles are, it knows they are not dangerous; certainly all of them are not. If the court does not take such notice, then the judgment of the lower court should be affirmed, since the judge as well as the jury actually inspected the tricycle in question as a part of the evidence in the case, and the same is not brought to this court.

The judgment appealed from, although predicated of a peremptory instruction, is presumed correct. Unless, therefore, this court judicially knows that all railway tricycles are so inherently dangerous that the owners of them are responsible for the acts of all persons to whom their custody may have been intrusted, the judgment appealed from must be affirmed. The judge below, who had the tricycle before him, adjudged that the particular tricycle was not dangerous. How can this court say it was dangerous in the absence of the evidence, or any part of

it, upon which the court below acted? The court below adjudged from an inspection of the particular tricycle that it was so far from being a dangerous implement that a verdict could not be maintained predicated of the finding that it was dangerous. Can this court, without the evidence before it on which the judgment was based, say that such judgment was erroneous? Most certainly not.

Vicious animals, poisons, and dangerous premises, including in such premises railroad turn-tables and other structures which are alluring to children, not being under consideration, we propound the following proposition and definition: A dangerous implement within the meaning of the law is a contrivance which, through the employment of dangerous agencies, such as steam, electricity, dynamite, gunpowder, and the like, frequently passes, or is likely to pass, beyond human control. Such contrivances are easily distinguishable from those operated by the hand or foot of man, and which are certainly subject to his control, except under an unusual combination of circumstances.

Argued orally by *R. L. McLaurin,* for appellant, and by *R. H. Thompson,* for appellee.

TRULY, J., delivered the opinion of the court, the majority opinion.

Considering the time, place, and circumstances under which the injury forming the basis of this suit was inflicted, we think the question of whether Watson, the employe of appellee, to whose negligence the injury is charged, was on that occasion acting outside the scope of his employment, should have been submitted to the consideration of the jury. The record demonstrates that the relation of master and servant existed between Watson and appellee, and, this being established, the question of whether, in the particular instance, the servant was acting within the scope of his employment, if there is no conflict in the facts, is a question of law for the court. If there is con-

flict, it is a question of fact to be submitted to the jury. *Brewing & Malt. Co.* v. *Huggins,* 96 Ill. App., 147; *Krzikowsky* v. *Sperring,* 107 Ill. App., 493; *Railroad Co.* v. *Latham,* 72 Miss., 36 (16 South. Rep., 757). And in order to escape liability it devolves upon the master to prove that the servant had abandoned the duties of his employment, and gone about some purpose of the servant's own, in which the master's business was not concerned, and which was not incident to the employment for which the servant was hired. If the testimony leaves this question in doubt, it must be submitted to the jury. *Ritchie* v. *Waller,* 63 Conn., 157 (28 Atl., 29; 27 L. R. A., 161; 38 Am. St. Rep., 361, and citations).

In the case at bar it was the servant's duty to attend to the steam pump located on appellee's line of railroad, and used in supplying water to locomotives of passing trains, and have it ready for operation whenever needed for this purpose. In connection with, and as a part of, this employment, it was the servant's duty to provide the fuel consumed in generating the steam needed for the operation of the pump. But the manner, time, and place of gathering this fuel were submitted to his judgment without express directions from appellee. The servant was required to see that the needed fuel was provided, but the details of its gathering were left to the dictation of his pleasure and convenience. For his use in going to and from the pumping station, and for transporting fuel and kindling which he would gather along the right of way, Watson was intrusted with the custody and power to use an engine or machine known in the record as a "railroad tricycle." Upon this, in quest of fuel, he had the right to ride over the track of appellee's line of railway, without let or hindrance, any distance and in any direction. On the morning in question, in the discharge of his duty, he took the tricycle and proceeded to the place where his duty called him—where the pump which he was to operate was situated. Finding that it was necessary to procure fuel, he went further down the track in search of kindling or

firewood, with the intention of proceeding to a trestle, where certain bridge work had recently been done, with the hope of procuring the necessary fuel at that place. Before reaching this place, and without discharging the duty which was incumbent upon him, for purposes of his own he went by the place which he had chosen as the one where he would gather his fuel, and proceeded with his tricycle to a station some miles distant. Having completed this errand—undertaken, admittedly, for his own pleasure—he again started with the tricycle to retrace his course to the spot where his duty to his master called him; but before reaching this place, he negligently ran the tricycle against and seriously injured the appellant, who was walking across a trestle and could not avoid the collision. It is contended that, inasmuch as Watson had passed by the spot where he should have gathered the fuel, this was a departure from his duty to his master, and that the master was not liable for his acts, or for any injury which he might inflict, until he had actually returned to the spot where the fuel was.

We recognize the well-established exception to the general rule by which the master is excused from liability for the tortious act of the servant when committed outside the scope of the servant's employment. That exception governs in all cases when the servant abandons his master's service and engages in some purpose personal to himself. The principle is free of difficulty, and is adhered to in all proper cases, but it has no application to the facts in the instant case. Watson was no mere sentient tool, with no power to exercise judgment or discretion as to the time or manner in which his duties should be performed. He was intrusted with the performance of a certain duty, but the details of his service were not regulated or prescribed by the instructions of any superior, but left solely to his own uncontrolled judgment. For the acts of such servants the master is responsible unless it clearly appears that the wrongful acts were beyond and outside the scope of their employment and committed in the furtherance of their own per-

sonal ends. "The master is responsible for the negligent acts or omissions of his servants in the course of their employment, though unauthorized or even forbidden by him, and although outside of their 'line of duty,' and without regard to their motives." 1 Shear. & Red., Negligence, sec. 146. And the master cannot escape liability, even though the acts of the servants were "unauthorized, willful, and wrongful." *Id.*, sec. 150; 1 Thompson, Negligence, secs. 518, 519. And this is the recognized rule in this state, even though the party injured is a trespasser on train or track. *Railroad Co. v. Harris,* 71 Miss., 76 (14 South. Rep., 263); *Richberger v. Express Co.,* 73 Miss., 161 (18 South. Rep., 922; 31 L. R. A., 390; 55 Am. St. Rep., 522).

In determining whether a particular act is committed by a servant within the scope of his employment, the decisive question is not whether the servant was acting in accordance with the instructions of the master, but, Was he at the time doing any act in furtherance of his master's business? If a servant, having completed his duty to his master, then proceeds to prosecute some private purpose of his own, the master is not liable; but if the servant, while engaged about his master's business, merely deviates from the direct line of duty to accomplish some personal end, the master's responsibility may be suspended, but it is reëstablished when the servant resumes his duty. Even if in violation of express orders, a deviation from is not an abandonment of the master's service. *Mulvehill v. Bates,* 31 Minn., 366 (17 N. W., 959; 47 Am. St. Rep., 796); *Rahn v. Singer Mfg. Co.* (C. C.), 26 Fed. Rep., 912; *Weber v. Lockman* (Neb.), 92 N. W., 591 (60 L. R. A., 313); *Sleath v. Wilson,* 9 Carr. & Payne, 607; *Ritchie v. Waller, supra; Williams v. Hochler,* 41 App. Div., 426 (58 N. Y. Supp., 863); *Quinn v. Power,* 87 N. Y., 535 (41 Am. St. Rep., 392).

If the act which the servant was engaged in at the time of the injury was one which, if continued until its completion, would have furthered the master's business and been within

the scope of the servant's employment, the master would be liable, even though the act occurred at a place to which his duty did not necessarily call him. *Geraty* v. *Nat. Ice Co.,* 16 App. Div., 174 (44 N. Y. Supp., 659). This class of cases is plainly distinguishable from those in which there has been a departure —a turning aside—from the master's business to engage in an affair not incidental to his service, but purely of the servant's own. The principle of law governing each class is well understood, the main difficulty being the classification of the particular case.

In the instant case it was the duty of Watson to procure fuel. He was given control and custody of an appliance to be used for that purpose and in going to and from his work. On the occasion in question he went by the place where his duty called him, on an affair in no wise connected with the master's business or his own service. That moment he deviated from his duty and from the scope of his employment. It must be noted that the service of the day in which the servant was then engaged— the gathering of the fuel and operating of the pump—had not been discharged when Watson deviated from his service. But the testimony of the servant himself shows that he had not abandoned his duty. He still intended to gather the fuel on his return from his own errand, and to regain his post of duty at the pump. It is conceded by counsel for appellant, so far as the discussion of this particular phase of the case is concerned, that, for any injuries which Watson might have inflicted between the time when he deviated from his service and when he resumed it, the master was not responsible. We express no opinion of this point; but, even if it be true, the inquiry arises; When did Watson resume his service, so as to render his master liable? His private affair was to carry a sick friend to the station, but when that was completed and he began to propel the railroad tricycle back over the route which he had previously traveled, with the intention and for the purpose of proceeding to the discharge of the duty which he was employed to perform;

he then resumed his master's service, which had been suspended temporarily while he was engaged about his own affairs. The argument that Watson did not resume his duty until he actually reached the spot where he was to gather the fuel rests on no solid legal foundation. He was operating the appliance which it was his duty to operate. He was on the track at a place which he was compelled to pass over, and proceeding to the place where his duty called, for the purpose of performing that duty, and was at the time of the injury engaged about no affair of his own, but discharging in the usual and customary manner the business for which he was employed. Under such circumstances the master is answerable for the tort of the servant.

We hold, in cases where the servant has made a temporary departure from the service of the master, that when the object of that departure has been accomplished and the servant reengages in the discharge of his duty, the responsibility of the master instantly attaches. Any other conclusion would leave us without any definite rule, in cases of temporary abandonment of duty, to determine when the servant reëntered the scope of his employment. This conclusion is not antagonistic to any express decision in this state or in Louisiana, where the injury happened. Speaking of the doctrine of the responsibility of the master for the torts of the servant, the supreme court of the latter state has said: "The law is simple. Masters and employers are answerable for the damage occasioned by their servants and overseers in the exercise of the functions in which they are employed. Rev. Civ. Code, art. 2320." Odom v. Schmidt, 52 La. Ann., 2129 (28 South. Rep., 350).

In this state the exact question here presented has never been passed on. The cases cited by appellee are all based on the fact that the act complained of was one clearly beyond the scope of the servant's employment. The final test to determine the master's liability is thus stated in the case of Canton Co. v. Pool, 78 Miss., 157 (28 South. Rep., 824; 84 Am. St. Rep., 620): "Whether, from the nature of the act itself, as actually done,

it was an act done in the business, or wholly disconnected there-from, by the servant, not as servant, but as individual, on his own account." The facts of the case at bar demonstrate that the act here complained of was done at a time while the servant was engaged in the master's business, by the use of the master's appliances, used in the way they were intended to be, and was wholly disconnected from any personal enterprise of the servant.

The conclusion we have reached is supported by authority elsewhere. Thus in *Chi. Con. Bottling Co.* v. *McGinnis*, 86 Ill. App., 38, the master was held liable for injuries inflicted by the driver of his wagon, though the driver had temporarily departed from his employer's service, and had deviated from the direct route over which his duty required him to pass, on an enterprise purely personal to himself—namely, to call on his wife—and the accident occurred after the completion of this personal mission, at a time when the servant had again assumed control of his master's vehicle, but before he had actually again performed any act in the master's service. Says the court: "It is contended, first, that when a servant, acting as driver of his master's wagon, leaves the direct route of his business and goes upon some errand of his own, the master cannot be held to respond for negligence of the servant while upon such errand." And after discussing the other questions presented and stating the general rule governing the master's liability as we have herein announced it, the court responds to the contention, say-ing: "We are of the opinion that, applying the rules to the facts of this case, it cannot be held that the driver of the appellant, when he again started on his business of delivering goods of appellant, after having stopped upon an errand of his own, was not engaged in the master's work, within the scope of his em-ployment." So, in *M., K. & T. Ry. Co. of Texas* v. *Edwards* (Tex. Civ. App.), 67 S. W., 891, the facts were: A brakeman on the train of the appellant abandoned the master's service on the train which he was assisting in operating, crossed the track on the opposite side of the train, and went on an errand of his

own into a near-by saloon, and, having completed that errand, injured the plaintiff on his way back to regain the post of duty. One of the issues was: "If said brakeman did cause said injuries, whether he was then in the discharge of his duties as such brakeman." The court, on that state of facts, presenting the same legal question as the case before us, deciding the question in the affirmative, said: "Whether or not the brakeman was in the discharge of his duties when he knocked appellee under the train was more a question of law than one of fact. His place of duty was on the opposite side of the train, but the evidence of appellee tended to show that he had gone to a saloon or restaurant on the side of the train where the accident occurred, and was hurriedly returning to board the train, then just moving away, when he ran against appellee. While he may not have been on his master's business in stepping aside to the saloon or restaurant, we think it must be held that he was when he ran over appellee in the effort to resume his accustomed place of service." And as bearing upon another phase of Watson's duty to the appellee—that of safely caring for and returning the appliances of the master used in the dispatch of his business—see *Pitts., St. L. & Cin. Ry. Co.* v. *Kirk,* 102 Ind., 404 (1 N. E., 849; 52 Am. St. Rep., 675). In that case a section foreman was returning with his crew, car, and tools over the track of the master, and, finding a car on the track between him and the place where it was his duty to return the car and crew, he, without authority, removed the car from his master's track and placed it on the track of another railroad company, thereby causing an accident, and the master was held liable. Treating of the actions of the servant in this regard, the court observed: "In all this, whatever his motive was, he was pursuing the master's service—that of returning the car, tools, and crew to their appointed place, as was his custom and duty; and while he pursued the service in an unauthorized and possibly forbidden way, he and those with him were during the time in the relation of servants to the appellee. Concede that in going

off the employer's line he pursued a course which was beyond his authority; his purpose in doing so was nevertheless to accomplish an end within his employment, and reasonably, as he supposed, fitted to reach that end." See also *E. St. L., etc., Ry. Co. v. Reames,* 173 Ill., 586 (51 N. E., 68); note to *Ritchie v. Waller,* 27 L. R. A., 161; *Whitman* v. *Pearson,* 37 L. J. C. P., 156.

Under the facts of this case it was error in the court to charge, as a matter of law, that Watson was not acting within the scope of his employment when the injury was inflicted on appellant.

There is another theory developed by this record, which the appellant was entitled to have submitted to the consideration of the jury. It grows out of the well-established principle of law that a master who intrusts the custody and control of a dangerous appliance or agency to the management of a servant will not be permitted to avoid responsibility for injuries inflicted thereby on the plea that the servant, in the particular act complained of, was acting outside the scope of his employment. As stated in another connection in this opinion, we adhere to the general rule which exonerates the master from liability for the acts of the servant committed beyond the scope of his employment; but this rule is not of universal application (being itself but an exception to the general rule which primarily imputes liability to the master), nor is it antagonistic to the position here assumed. The servant is empowered by the master to discharge certain duties, and it is incumbent upon him to exercise the same care and attention which the law requires of the master; and if that care and attention be about the management and custody of dangerous appliances, the master cannot shift the responsibility connected with the custody of such instruments to the servant to whom they have been intrusted and escape liability therefor. This rule arises from the absolute duty which is owing to the public by those who employ in their business dangerous agencies or appliances, en-

gines or instruments—liable, if negligently managed, to result in great damage to others. The true rule, and the one supported by reason and authority, is thus stated in *P., C. & St. L. R. Co.* v. *Shields,* 47 Ohio St., 387 (24 N. E., 658; 8 L. R. A., 464; 21 Am. St. Rep., 840): "If the master intrusts the custody of dangerous agencies to his servants, the proper custody as well as the use of them becomes a part of the servant's employment by the master, and his negligence in any regard is imputed to the master in an action by one injured thereby. And where the injury results from the negligence of the servant in the custody of the instrument, it is immaterial, so far as the liability of the master is concerned, as to what use may have been made of it by the servant." In such cases the duty of the servant is to carefully guard and control such instrument, and a failure in this respect is not a departure from the master's service, but a negligent discharge of that service. This distinction is plainly marked. As said in the Shields case, *supra:* "A servant may depart from his employment without making his master liable for his negligence when outside the employment of the master, and he so departs whenever he goes beyond the scope of his employment and engages in affairs of his own. But he cannot depart from the duty intrusted to him, when that duty regards the rights of others in respect to the employment of dangerous instruments by the master in the prosecution of his business, without making the master liable for the consequences; for the first step in that direction is a breach of the duty intrusted to him by the master, and his negligence in this regard becomes at once the negligence of the master." This rule applies in all cases where agencies liable to be the means of inflicting serious injury upon others are placed in the custody of servants. The rule is designed for the protection of the public. As the master, if personally in control of the agency or appliance, would be liable for all injuries inflicted by its mismanagement or misuse, so he is not permitted to delegate the performance of the absolute duty of

85 Miss.—29

care which is imposed on him in its custody and control so as to shift the responsibility for a failure to discharge it. *Birmingham W. W. Co.* v. *Hubbard,* 85 Ala., 179 (4 South Rep., 607; 7 Am. St. Rep., 35); *Tex. & Pac. R. Co.* v. *Scoville,* 62 Fed. Rep., 730 (10 C. C. A., 479; 27 L. R. A., 179; 27 L. R. A., 200, note); 1 Thompson, Com. on Neg., secs. 523–533; *Euting* v. *Chi. & N. W. Ry. Co.,* 92 N. W., 358 (60 L. R. A., 158; 96 Am. St. Rep., 936); *Regan* v. *Reed,* 96 Ill. App., 462; *Alsever* v. *Minn. & St. L. Ry. Co.,* 115 Iowa, 338 (88 N. W., 841; 56 L. R. A.; 748). The case last cited was one where the servant into whose hands the master had committed the custody of an appliance to be used in its service allowed the steam or spray to escape so that a child standing by became frightened, fell, and was injured. The plaintiff sought to prove that the steam or spray was blown off with the deliberate design of frightening the children. The railway company defended on the ground that the escape of steam was incident to the operation of the engine, and was so used on the occasion in question. But the master was held liable; the court, after a full discussion of the question, in which numerous authorities are cited and analyzed, stating its conclusion as follows: "The company had placed in his charge an instrumentality requiring care in its operation and management. He was doing precisely what the company contemplated he should do when it employed him —*i. e.,* operating the blow-off cock. When this was to be done, and how, as said, was left to his discretion, the use of which was also contemplated in his employment; and the company was as responsible for a mistake or willful perversion of judgment in its operation, if within the compass of what he was to do, when amounting to negligence, as for his negligence in doing that which may be conceded to have been necessary."

The absolute duty of the master, which cannot be delegated, in reference to the degree of care demanded in the custody, control, and operation of dangerous instrumentalities, applies not to those alone which are operated or propelled by the power

of steam, electricity, powder, dynamite, or kindred forces, but to all instrumentalities employed by the master which, by reason of the method of their operation, are capable of, and liable to, inflict serious injury to others. The motive power is not the sole consideration in determining whether an instrumentality falls within the general classification of "dangerous agencies and appliances."

An attempt has been made, in a very few illogically reasoned cases, to draw a distinction between instrumentalities "dangerous in themselves" and those "dangerous by reason of improper use," and confine the master's liability to cases due to mismanagement of the former class alone. An analysis will show that the distinction is more imaginary than real, and too refined to be of any practical benefit as a method of determining legal responsibility. The argument has a degree of plausibility when limited to agencies inherently dangerous even when most carefully handled, such as dynamite and similar substances, as distinguished from those of like character, such as gasoline, naphtha, and the like—only dangerous when proper precautions are not observed; but the sophistry of the argument becomes apparent, and refutes itself, when we come to the consideration of dangerous engines, machinery, or appliances. No appliance is "dangerous of itself," but practically every appliance may become "dangerous by improper use." Neither a locomotive, pile driver, electric or cable car, automobile, threshing machine, or team and wagon is "dangerous of itself," yet with practical unanimity the courts hold the master liable for damages caused thereby, even though the servant who has the sole custody and control thereof is at the time acting willfully, wantonly, and in disobedience to his master's orders. And so, on the other hand, an ax, a crowbar, a scythe, and similar implements in daily use, are equally as deadly when improperly used; but no court would hold a master liable for the tortious act of his servant on the ground alone that he had intrusted the custody of such appliance to the servant. No appliance when at rest is

"dangerous in itself." It is by operation alone that it becomes capable of causing injury. So, in our opinion, a better test, though probably not itself without exceptions, of the master's liability, would be whether the agency or appliance, the custody and control of which he committed to his servant's judgment and discretion, was "dangerous in itself," or liable to inflict serious injury to others, when operated in the customary method of use and while being devoted to the purposes for which it was designed. If so, the public safety demands that he shall be answerable for the exercise of his servant's judgment. We are not without eminent authority for this position: "Whenever a master sends his servant out beyond his own eye and immediate control, in the custody of any species of property of the master which, unless properly cared for, guarded, and used, is liable to work injury to third persons, it is necessarily a part of the duty which the master commits to the servant so to care for, guard, and use such property as that it shall not work such injury." 1 Thompson, Com. on Neg., sec. 589; *V. & J. R. Co. v. Patton,* 31 Miss., 156 (66 Am. Dec., 552); *N. & C. R. Co. v. Starnes,* 9 Heisk., 52 (24 Am. St. Rep., 296); *Phil. Ry. Co. v. Derby,* 14 How. (U. S.), 468 (14 L. ed., 502); *Erie Ry. Co. v. Salisbury* (N. J. Err. & App.), 50 Atl., 117 (55 L. R. A., 578). And the soundness of this proposition is plainly recognized by this court in *Canton Co. v. Pool, supra.* Though its application to the facts of that case was correctly denied, it being there said that the case there presented was "not like cases when the question is as to the custody of dangerous implements, as steam engines, dynamite, torpedoes, etc., thus expressly recognizing that the same rule controls whether the injury be caused by an agency 'inherently dangerous' or by an 'implement' which only becomes dangerous by reason of misuse." In *Erie Ry. Co. v. Salisbury, supra,* the master was held responsible for the acts of the servant for injuries inflicted by a "push car" which had been placed in the custody of the servant, although at the time of the injury the car was not

being used in the service of the railroad, but in the business of a third person to whom the servant had loaned the car. The court says: "When the company placed the push car in the hands of the foreman, it was the duty of the foreman to use it with reasonable care to prevent injury to any one lawfully on the tracks and to keep it under his own supervision until it was returned to the company. For the performance of that duty by the foreman the company was bound, and the failure of the foreman to perform it was the failure of the company. The company cannot claim immunity on the ground that its servant violated the instructions given to him, any more than it could set up in defense that an engineer had violated the express instructions given to him to ring the bell at a public crossing." And the decision in the case is grounded upon the true basic principle: "The obligation to see that the duty is performed is cast upon the owner of the road. The safety of the public demands that the company shall be strictly held to its performance."

It is, of course, impracticable, if not impossible, to state any general definition by which it may be decided with any degree of certainty what appliances or agencies do, and what do not, fall within the term "dangerous," as employed by courts and text writers. The limit of human inventive genius has not yet been reached, and appliances are as variant as the uses to which they are devoted. And, again, something must depend on the circumstances attendant upon the use of the particular instrumentality in question. But we see no reason, justice, or legal principle in the distinction which would allow compensation for an injury inflicted by the misuse of a locomotive, electric car, or horse and wagon, and yet deny recovery, though the injury is to the same extent, and inflicted under similar circumstances, when caused by the mismanagement of a hand car or railroad tricycle. While the propelling power differs in each instance cited, all are subject to human control, and all

are alike liable to cause serious injuries to others, and this is the real reason on which the liability of the owner is founded.

The views we have herein announced, and the principle on which the liability of the master is based, are clearly recognized by the supreme court of the United States in *Railroad Co.* v. *Derby, supra.* In summing up the whole matter, the court says: "The intrusting such a powerful and dangerous engine as a locomotive to one who will not submit to control is itself an act of negligence—the '*causa causans*' of the mischief—while the proximate cause, or the *ipsa negligentia* which produces it, may truly be said in most cases to be disobedience of orders by the servant so intrusted. If such disobedience could be set up by a railroad company as a defense, when charged with negligence, the remedy of the injured party in most cases would be illusive, discipline would be relaxed, and the danger to the life and limb of the traveler greatly enhanced. Any relaxation of the stringent policy and principles of the law affecting such cases would be highly detrimental to the public safety. And these expressions apply with more striking force to the condition of affairs which would exist if railroad companies who intrust dangerous appliances to an untrustworthy servant were permitted to say that at the time of any alleged injury such servant was not acting within the scope of his employment. If this be the law, the recovery of all persons injured by the misuse of such appliances is largely dependent upon the veracity of the employe by whose negligence the injury is caused.

In the case at bar it is contended by the appellee that inasmuch as the tricycle, by the running of which the injury was inflicted, was before the trial court, and by the trial judge examined and pronounced not to be a dangerous appliance, we should on this account accept this finding of fact by the trial judge as conclusive, and not disturb the judgment. The decision of facts is not within the province of the judge. Whether or not the railroad tricycle, as propelled, and moving at the rate

of speed testified to, when it struck appellant, was a dangerous instrumentality, liable to cause serious injury, should have been submitted to the jury for decision in the light of the testimony and their personal examination of the tricycle in question.

It is not necessary, as the record is here presented, for us to discuss or decide the exact legal status of appellant at the time or the exact duty which appellee owed to appellant under the circumstances attending the injury, for the reason that a peremptory instruction was granted appellee, and appellant is entitled to have the testimony in his behalf accepted and considered as true. So treating it, the record shows that appellant was injured by the gross negligence of the employe of appellee, who, knowing appellant's perilous situation, wantonly caused the injuries complained of. If this be true, contributory negligence would constitute no defense, and appellant, even though a trespasser, would nevertheless be entitled to recover.

*Reversed and remanded.*

WHITFIELD, C. J., delivered the following dissenting opinion:

The facts in this case are briefly these: The plaintiff, a farmer, living in the country, several miles from defendant's line of railway, rode his horse from his farmhouse to the railway track, at a point between stations, hitched the animal near the track, and started on foot along the railway track, going westward to a town called "Delhi," over three miles distant from the place where plaintiff left his horse. One Watson was employed by the appellee railway company to pump water at a water station, a point on the west side of a stream called "Bayou Macon," distant about a mile east of Delhi, and he was furnished with a railroad tricycle, with which to carry himself from his home, at Delhi, to the pumping station; and he was also permitted to use the tricycle in gathering up chips with which to start the fire in the machinery which ran the pump. On the date of the accident resulting in plaintiff's injuries, Watson left home in the morning, riding his tricycle, went to the

pumping station, and finding there, on dismounting, no chips with which to start a fire in the machinery, he again mounted the tricycle and rode eastward to a point on the western side of Cow Bayou, where the appellee's bridge crew had shortly before been at work and had left a goodly quantity of splinters, chips, etc. Just as he reached this place on the west side of Cow Bayou, where the splinters and chips lay by the side of the track, an acquaintance (a Mr. Barmore, son of the plaintiff) put in his appearance. I understand the record as showing this to be the fact. This Mr. Barmore informed Watson that he was ill, and desired to be carried on the tricycle from the western side of Cow Bayou, where the parties then were, to a town or station on the railway called "Waverly," some three miles to the east. Watson took young Barmore on his tricycle and carried him to Waverly. After this, Watson rode on his tricycle westward from Waverly toward Delhi. On this return trip, and before he reached Cow Bayou—a stream which is crossed on a trestle 1,600 feet in length—Watson came in sight of the plaintiff as he was walking on the track, on his way from where he had left his horse to Delhi, and ran the tricycle carelessly and negligently against the plaintiff, and caused the injuries for which the suit is brought. It will be noticed that Watson had not, when the plaintiff was overtaken and struck, returned as far west as the point where the chips lay, and had not completed the excursion to and return from Waverly, made on his own responsibility. The court and the jury during the trial inspected the tricycle.

The true test as to whether an act is done by the servant within the scope of the master's business has been thrice recently stated with great care by this court. Those cases are: *Railroad Co.* v. *Latham,* 72 Miss., 32 (16 South. Rep., 757); *Richberger* v. *Express Co.,* 73 Miss., 161 (18 South. Rep., 922; 31 L. R. A., 390; 55 Am. St. Rep., 522); *Canton Cotton Warehouse Co.* v. *Pool,* 78 Miss., 147 (28 South. Rep., 823; 84 Am. St. Rep., 823). This last case seems to me conclusive

of the one at bar. In the Latham and Pool cases we quoted. with our emphatic approval the statement of this doctrine laid down by that great judge, Chief Justice Andrews, of New York, in *Rounds* v. *Delaware R. Co.,* 64 N. Y., 136 (21 Am. St. Rep., 597), which opinion is declared by Finch, J., in *Quinn* v. *Power,* 87 N. Y., 537 (41 Am. St. Rep., 392)—one of the cases cited by the majority of the court—to contain as "accurate an announcement of the doctrine on this subject as it is possible to make." The doctrine, therefore, on this subject needs no restatement, nor do I understand my brethren to differ in the least from the doctrine announced in the three cases from our own court above referred to. The difference between us results from a difference of view as to whether the servant in this case simply deviated from his master's business in doing the act which resulted in the injury or wholly departed from his master's business in doing said act. To my mind, nothing could be clearer than that Watson, the servant of appellee, employed to pump water at a watering station, never was in his master's service from the time he left the place on the west side of Cow Bayou, where the splinters and chips lay, until he returned to that identical point. His precise business was to pump water. Incidental to the performance of this duty, he was permitted to gather up chips and splinters along the track, with which to carry on his work. So, up to the time that he reached the place where the chips and splinters lay, he was doing his master's business. It was no part of his service to his master to take a sick man (young Barmore, plaintiff's son) three miles east of the point where the chips lay, clear away from the scene of his duty. This was purely an excursion of his own, totally distinct from his master's business. He did it out of good motives, doubtless—to aid the sick man—but in doing it he totally departed from the service of his master from the time he left the place where the chips lay until he got back to that place. Neither in going from that place to take the sick man three miles to Waverly, nor in returning, was he, in any proper legal

sense, for one moment engaged in the service of his master. If so, he could just as logically be held to have been engaged in his master's service if he had taken the sick man on his tricycle to Jackson or Meridian; and yet I apprehend that my brethren would hardly hold that if he had taken this sick man to Jackson or Meridian, and inflicted this injury on appellant on the trestle on the return trip, the railroad would be liable. Surely no such stretch of the doctrine as that would be approved by my brethren. The error into which the majority of the court has fallen, as I humbly conceive, is in confusing deviation from the master's service with a total departure therefrom; and this, I think, can be easily demonstrated by a review of the authorities cited in the opinion of the majority to support their conclusion. Let us now take up each of these authorities and see what the exact facts were in them. I will examine each case in the order in which it is cited:

In the case of *Mulvehill* v. *Bates,* 31 Minn., 364 (17 N. W., 959; 47 Am. St. Rep., 796), the servant drove an express wagon regularly for the master, picking up business on the streets. On the day in question he had gone over to West St. Paul to deliver a trunk; then he went a block and a half in a direction away from his return route to St. Paul, and got a load of poles for himself, and was taking the poles home when he ran over the boy. The court say: "We understand from this that the horse and express wagon were intrusted generally to the driver, with authority to secure such business as he could, make his own contracts, and drive wherever it might be necessary to go in order either to receive or deliver any articles which he might be employed to transport. Had some one employed him to transport a load of poles, it seems to us that there would have been no doubt but that in going for them, and in conveying them to their destination, he would have been acting within the scope of his employment, for that was just the kind of business he was employed to perform, as much as transporting trunks or any other kind of property. . . . He was intrusted generally with

the wagon, to hunt up just such work wherever he could find it, and with authority to carry articles for whomsoever he saw fit." And, again, the court say, distinguishing a previous case: "But here the wagon was intrusted generally to the driver, to be used entirely at his discretion. It is true that in that case (the one distinguished), but for a statute, the relation between the owner of the cab and the driver would have been that of a bailor and bailee, and not of master and servant. The statute created the relation of master and servant—a relation which in the present case confessedly existed. But as is expressly stated in the case referred to, it was only with regard to the employment of the cab, within the scope of the bailment, that the relation of master and servant was created. Hence there, as here, it had to be determined whether at the time of the injury the vehicle was being used within the scope of the bailment or employment; for, as it is there said, if the employment of the vehicle by the driver at the time the mischief was done was wrongful, in the sense that it was beyond the scope of the bailment, then the master would not be liable. So, in this case, if the driver had taken the wagon on an independent journey of his own, altogether out of the scope of the purpose for which it was intrusted to him, and an injury had then occurred, the defendant would probably not have been liable." So that decision clearly was, as shown by the syllabus, part of which is underscored, based on these facts: "The owner of an express wagon employed a servant to drive it, and intrusted it to him *generally,* to be used, at his discretion, in doing such business as he (the *servant*) *could secure in the way of employment for the wagon.*" The precise opposite is true here. This tricycle was not intrusted to the servant to be employed by him generally, in his discretion, but to do this specific thing of going to the pumping house and for gathering up chips. Surely what he did here was not in pursuance of this authority, but was just what the court called "an independent journey of his own." In other words, this express driver of the master's wagon, when he set

out for West St. Paul, carried a trunk to be delivered. Let it be specially noted that he was, in delivering this trunk on the outgoing trip, precisely engaged in the master's service, and, furthermore, that, under the general discretionary authority given him, he had authority to carry these very poles as well as trunks. It is plainly a case, so far as the carrying of the poles is concerned, of acting within the general authority given him. Here the servant, when he set out with Barmore for Waverly, was doing nothing for the master. He had no authority to carry sick people to distant places from the scene of his work. The case differs in two most vital particulars from the case at bar: First, that when he set out he was doing nothing for his master; second, that the tricycle was in no sense intrusted to be used generally, in his discretion, for any purpose he saw fit.

In the case of *Rahn* v. *Singer Mfg. Co.* (C. C.), 26 Fed. Rep., 912, Corbitt, the servant of the Singer Manufacturing Company, ran over the plaintiff in Franklin avenue, in the city of Minneapolis, at the time he had a Singer sewing machine in the wagon, which he was to sell upon commission, and was then engaged in trying to sell it. The case shows that Corbitt was employed to canvass and to sell such machines on terms to suit his own convenience, and had taken that trip to look after his own private business, but at the same time was pursuing the defendant's business; and the court expressly held that the company would be liable if Corbitt thus "combined his own business with that of the defendant, and was using the team not exclusively for his own ends, but at the same time was pursuing the defendant's business." And the court added: "If Corbitt had been attending to his own business, and was returning home from a private business trip or a pleasure trip of his own, and was engaged in business outside of the range of his employment by the defendant, at the time the plaintiff was run over, then, although he was using the wagon at the time which he used when engaged in the performance of the defend-

ant's business, the defendant was not liable. Corbitt must be shown to have been, at the time the plaintiff was run down, engaged in the business of the defendant." Here, also, specially note, Corbitt at the time of this injury had the Singer sewing machine on his wagon; was canvassing to sell it; had set out upon and was pursuing the master's business. There is not, in my view, the faintest resemblance between this case and the case at bar.

In the case of *Weber* v. *Lockman* (Neb.), 92 N. W., 591 (60 L. R. A., 313), Weber, Sr., had a farm and a herd of cattle. As a part of his business, the cattle had to be driven five or six miles from home and put in a pasture. His son proposed one Sunday morning to drive the cattle to pasture. Weber, Sr., objected because it was Sunday. The son, without the father's knowledge, drove the cattle to pasture, and then made a detour in returning, about a mile, to visit some friends. On coming back home, after nightfall, the horse became frightened, ran away, and injured the plaintiff. The court said that the business of driving the cattle to pasture was part of the master's business, and the only question was whether it was done at the right time, and that, inasmuch as the boy had been engaged in the master's business in taking the cattle to pasture, it was his duty, as part of the same business, to return the horse to his master's stable. Note specially here that what the boy did on the outgoing trip was strictly part of the master's business—carrying the cattle to pasture—and, as a matter of course, that it was also part of his duty to the master to return the horse after executing the duty of taking the cattle to pasture. I repeat, what the servant did here, on the outgoing trip to Waverly, was no part of the master's business whatever; and, as a matter of course, in coming back he was returning, not from doing the master's business, but from an independent journey of his own.

In the case of *Sleath* v. *Wilson*, 9 Carr. & Payne, 607 (38 Eng. Com. Law Rep., 249), the case was simply that the master

had intrusted the servant generally, as in the case of Mulvehill, *supra,* with the control of his carriage; and the servant, after having, on the outgoing trip, taken his master to Stamford street and setting him down there, instead of going straight home, deviated from his route to deliver a parcel of his own, in the Old Street Road, and, in returning, injured an old woman. This, like the case of the boy driving the cattle to the pasture, is, I think, plainly a case of mere deviation from the master's business, not total departure therefrom. Note specially, on the outgoing trip the carriage driver was engaged in the master's business—driving the master himself—and it was his duty, of course, to the master, to return the carriage home. It is to be observed also, with respect to this case, that the case of *Lamb* v. *Palk,* 38 Eng. Com. Law Rep., 261, makes clear what is here held in the Sleath case. In this last case "a van was standing at the door of A., from which A.'s goods were unloading, and A.'s gig was standing behind the van. B.'s coachman, who was driving B.'s carriage, came up, and, there not being room for the carriage to pass, the coachman got off his box and laid hold of the van horse's head. This caused the van to move, and thereby a packing case fell out of the van upon the shafts of the gig, and broke them. Held, that B. was not liable for this, since the coachman was not acting in the employ of B. at the time this matter occurred." The Sleath case, like the Mulvehill and Weber cases, is a case of mere deviation from the master's service. In all three the servant was engaged in the master's business in the outgoing trip and on the return trip, but simply on the return trip deviated from the master's service.

In the case of *Ritchie* v. *Waller,* 63 Conn., 155 (28 Atl., 29; 27 L. R. A., 161; 38 Am. St. Rep., 361), the master had employed a farm laborer to haul manure from a brewery to his farm. He went with him once, and showed him the usual route. Afterwards he directed the laborer to go and get manure, and Blackwell, the servant, with the wagon and horse of the de-

fendant, went to the brewery and procured a load of manure, and, in returning, instead of pursuing the usual route, he deviated slightly therefrom and went to see a shoemaker about mending his shoes. While he was in the shop the team ran away and injured the plaintiff, and the court said "that this, as was plainly shown, was a case of mere deviation." Note specially that on the outgoing trip he was engaged in the master's business, and that he on the return trip was hauling the manure for his master, and simply deviated to see about mending his shoes. The court, at p. 162 of 63 Conn., p. 31 of 28 Atl. (27 L. R. A., 161; 38 Am. St. Rep., 361), say: "In cases of deviation the authorities are clearly to the effect that a mere departure by the servant from the strict course of his duty, even for a purpose of his own, will not, in and of itself, be such a departure from the master's business as to relieve him of responsibility. 'Not every deviation of the servant from the strict execution of his duty, nor every disregard of particular instructions, will be such an interruption of the course of employment as to determine or suspend the master's responsibility. But where there is not merely deviation, but a total departure, from the course of the master's business, so that the servant may be said to be "on a frolic of his own," the master is no longer answerable for the servant's conduct.' Pollock on Torts, side p. 76." Again, at p. 165 of 63 Conn.; p. 32 of 28 Atl. (27 L. R. A., 161; 38 Am. St. Rep., 361), the court say: "Applying these principles to the case at bar, the question for the court below was whether or not Blackwell for the time being totally departed from the master's business and set out upon a separate journey and business of his own." To me, a stronger case for appellee could hardly be cited. It states the precise distinction between deviation and departure from the master's business, which, as I conceive, my brethren have unconsciously confused.

In the case of *Williams* v. *Koehler,* 41 App. Div., 426 (58 N. Y. Supp., 863), the facts were: "The plaintiff, a boy seven years old, was standing at the edge of the sidewalk, by the side

of a coal box which stood there, looking at other boys playing in the street. There was a push cart in the carriageway, immediately in front. The driver of one of the defendant's beer trucks left his truck and team standing unattended in the street, in front of a saloon near by, while he went in to see a sick friend. During the driver's absence the horses started, and when they had gone from twenty to forty feet a stranger stopped the team and drove them back to the saloon. In so doing he drove the truck against the push cart, which, being overturned, threw the boy against the coal box. The driver of the truck testified that he was on his return to the brewery, having delivered all the beer, and his truck was full of empty kegs. He further stated that where the accident occurred was not on his direct route to the brewery, but that he had deviated from his course for a couple of blocks for the sake of stopping to see a friend. . . . The duty of the driver's employment required him to drive the truck back to the brewery. Though he deviated from his direct road, still the conduct and management of the team on the course he took were none the less services in the course of his employment. At most, his acts constituted misconduct in his employment, not an abandonment of it. The case is not at all similar to one where the servant takes his master's team for a purpose unauthorized and solely his own. In such a case the driver would not be acting in the service of his master. But here the driver did not take the truck as a vehicle or means of transporting himself the two blocks he went out of his way; but, intending to go to see his friend, and at the same time intending to return the truck to the brewery, as was his duty, he drove the truck over the route adopted for the very purpose of continuing his service, in taking charge of the team and truck, and not for his own purposes. . . . It is true that the act of the driver in going into the saloon was not in his master's service. For that reason had he, while entering the saloon, by his carelessness run against and injured any one, the master would not have been liable. It was not the going

into the saloon that caused the accident, but leaving the horses unattended and untied; and this was negligence in the master's business, for it was the duty of the master not to leave his team unsecured." The court puts it so plainly that we cannot add to the clearness of what the court said at pp. 427, 428, of 41 App. Div.; p. 864 of 58 N. Y. Supp. This I also regard as a strong authority for appellee. The servant was engaged in the master's business—driving his truck and team on a return trip to the brewery with empty kegs. It was his duty, as said, to drive the truck with the kegs back to the brewery, and all that he did was simply to deviate at the time he went into the saloon to see a sick friend; and the injury was caused, not by going into the saloon, but by negligence in leaving the horses unattended. The case, as I see it, has no resemblance to the case at bar.

In a late case on this whole doctrine of deviation—the case of *Quinn* v. *Power,* 87 N. Y., 535 (41 Am. St. Rep., 392)— Finch, J. (one of the greatest judges New York has ever produced), makes the difference between deviation and departure perfectly plain. In that case the master's business consisted in transporting persons and freight over the river on a ferryboat between Hudson and Athens. The plaintiff, who wanted to get on a canal boat standing out in midstream, was permitted by the servant managing the ferryboat to come on board at Athens, and was to be transferred to the canal boat, in midstream, as a matter of favor. In doing this a slight deviation from the usual track of the boat across the river was made, but the ferryboat at the time was transporting freight and passengers between Hudson and Athens. The court say: "At the most, it appears to us a case where the servant, while acting in the master's business and within the scope of his employment, deviated from the line of duty to his master and disobeyed his instructions." And on p. 540 of 87 N. Y. (41 Am. St. Rep., 392) added, citing certain cases: "These cases are useful to illustrate the idea that there may be a deviation from the serv-

ant's duty in his employment, and that, too, for some purpose or from some motive of his own, without his ceasing to be an actor within the scope of his employment and in the range of his master's business. The case is put by the appellant mainly on the ground that the officers of the ferryboat, in transferring the passenger to the canal boat, were simply doing the latter a personal favor, and so carrying out a separate and independent purpose of their own. That is not in all respects a correct view of the transaction. What he did was in the natural line of his employment, might well have been regarded by him as a duty due to his master, and an act which would benefit rather than injure his business. It was an act within the general scope of that employment. It was the transportation of a passenger, if not across the river, at least partly across, and none the less so because no compensation or fare was demanded." Here, too, as it appears to me, is another strong case for appellee—a slight case of mere·deviation. The servant at the time was engaged in the transporting of freight and passengers—the business of his master. Was this servant in the case at bar engaged in the business of the master in taking Barmore, the sick man, three miles away from where the chips were, to Waverly? What business of the master, pray?

In the case of Geraty, 16 App. Div., 174 (44 N. Y. Supp., 659), the driver and helper of one of the defendant's large trucks, which were employed in transporting and delivering ice from defendant's storehouse to customers in the city, deviated from the usual route and stopped at a restaurant to get breakfast. The ice had been negligently loaded on the truck, and a block of ice fell off and injured the plaintiff. The court said: "The rule as laid down by the latest cases in the English courts is that a master is responsible for an injury resulting from the negligence of his servant while driving his cart, provided that the servant is at the time engaged in his master's business, even though the accident happens in a place to which his master's business did not call him. But if the journey upon which the

servant starts be wholly for his own purposes, and without the knowledge or consent of the master, the latter will not be liable." The court further says: "In this case the act that the servant was employed to do was to take this ice from its warehouse to the Grand Central Station. The route taken was not the direct route. But that fact of itself does not relieve the master from his liability. Within the cases above cited, the liability still continues unless the deviation is made, not in the prosecution of the master's business, but for some other and different purpose. The distinction is well illustrated in the cases of *Cavanagh* v. *Dinsmore*, 12 Hun., 465, and *Sheridan* v. *Charlick*, 4 Daly, 338, in which the servant, having been directed to use his master's horse and carriage for a particular purpose, and then to put it up in the stable, instead of doing so, after the master's business had been performed, went off in another direction, in the prosecution of his own affairs and for his own purposes. In those cases it was held that the enterprise undertaken by the servant, during which the accident happened, being solely for his own purposes, the defendant was not responsible for it. In this particular case, so long as Sweeney and McQuade were engaged in taking this ice to the Grand Central Station, they were engaged in the prosecution of the master's business, and it was liable for their acts. The liability ceased, if at all, only when they were not engaged in taking the ice to the place where they were directed to take it.  .  .  .  We think that the defendant was not entitled to be relieved from liability if the accident happened after Sweeney had taken his place upon the wagon and resumed his course toward the Grand Central Station, and the accident was caused by the slipping of the ice from the wagon. At that time Sweeney, whatever may have been his object in deviating from the direct route, was again proceeding to deliver the ice. He had accomplished whatever purpose he intended to accomplish by the deviation, and had resumed the execution of the work which the defendant had intrusted him to do.  .  .  .  If he had been forced by a block-

ade of the streets to turn out of the direct route and go in the direction in which he did go, no one would doubt that the master would be liable, because he would have been engaged, when he was moving in that direction, in the transportation of the ice to the place where it was intended that he should take it. . . . We think that cannot be the rule; but if the master's liability has been suspended while the servant has deviated from the route for his own purpose, the liability again attaches after he has resumed the prosecution of the master's business, if the conditions which then existed have not been altered by the act of the servant, so that some new negligent cause has intervened, for which the master was not originally liable. That is not this case. . . . If there had been a suspension of liability, that suspension had come to an end, because he had resumed the prosecution of his master's business." Note specially here, also, that the servant was engaged in his master's business on the outgoing trip—hauling ice; and not only so, but, as stated by the court, was engaged in the master's business after the suspension was over—hauling ice. What possible analogy can there be between a case of slight and temporary deviation from the master's business, like this case, and a total departure, as I see it, from the master's business, like the case at bar?

In the case of *Chicago* v. *McGinnis,* 86 Ill. App., 38, the facts were that the master's business consisted in having goods delivered in the city by a wagon owned by the master, and that the servant, while engaged in delivering appellant's goods, deviated slightly from the regular route to call upon his wife, and that, after leaving the house of his wife, he was again proceeding upon his master's business, when a boy, who had climbed upon the steps of the wagon, was injured. It further appears that the place where the driver stopped to see his wife was within the territory within which he delivered the goods of appellant; and what did the court say at p. 41 of 86 Ill. App.? Simply this: "We are of the opinion that, applying the

rule to the facts of this case, it cannot be held that the driver of appellant, when he again started on his business of delivering goods of appellant, after having stopped upon an errand of his own, was not engaged in his master's work, within the scope of his employment." The servant was engaged in the master's business, delivering goods within his proper territory, and simply deviated to see his wife, and, after such deviation, resumed the master's business, and, after such resumption and while engaged in the master's business, inflicted the injury. Can there be any similarity between that case and the case at bar?

In the case of *Missouri, etc., Ry. Co.* v. *Edwards,* 67 S. W., 891, we have a case not decided by the supreme court of Texas, but by one of its courts of civil appeals—an inferior appellate court. There a brakeman of appellant, while the train was standing still, went to a saloon or restaurant at one side of the train, and, while hurriedly returning to board the train, then just moving away, ran against and injured appellee. The court said nothing, except that, while he might not have been on his master's business in stepping aside to the saloon or restaurant, he was when returning to resume his accustomed place of service. The case is not reasoned out, and not a single authority is cited, and it is the judgment of an inferior tribunal. It may be barely possible to sustain the case on the theory that the servant was in the service of the master in attending to his business about the car, and had simply deviated from that service in going into the saloon or restaurant to get, it may be, some necessary meal. If this be not the true explanation of the case, then I do not hesitate to say that the decision is unsound.

In the case of *Pittsburg, Cincinnati, etc., Ry. Co.* v. *Kirk,* 102 Ind., 399 (1 N. E., 849; 52 Am. St. Rep., 675), it was the duty of one Cronin, in charge of a hand car, to meet his crew each morning at seven o'clock, and proceed on the car with men and tools along the line of his section, direct necessary repairs, and return in like manner to the tool house, at the depot, at six o'clock P.M. On the evening of the accident, after

quitting work and while returning, Cronin encountered an engine and train of cars which obstructed his further progress, and he thereupon directed the car to be transferred to the line of the Cincinnati, Hamilton & Indianapolis Railway Company, lying parallel to the track he was on; and, while proceeding on the line of the latter, his car was negligently propelled against the car on which Kirk, an employe of the latter railroad company, was, and a collision occurred, and Kirk was injured. And the court say: "To undertake to lay down a general rule applicable to all cases would not only be difficult, but impossible. But we think this much may be said: That where a servant is engaged in accomplishing an end which is within the scope of his employment, and, while so engaged, adopts means reasonably intended and directed to the end, which result in injury to another, the master is answerable for the consequences, regardless of the motives which induced the adoption of the means, and this, too, even though the means employed were outside of his authority and against the express orders of the master. 2 Thompson on Negligence, 889, sec. 6; Wood, Master & Servant, pp. 593, 594. . . . It was part of the section foreman's duty to return with his car, tools, and crew over the defendant's track to the tool house, near the depot, as well as to observe the condition of the track, so as to have his car and tools there ready for use at 7 o'clock the next morning. The prescribed route was over the track of the railroad in whose service he was. He had no authority to go upon the other, but, encountering an obstacle on the line of his employer, either for his own convenience or possibly to accommodate the other servants of the master, and thus make them better disposed toward its service, he judged it convenient or expedient, rather than wait until the appellant's line was cleared, to invade the neighboring line; and by that means he attained the end of delivering the car, tools, and crew at their destination. In all this, whatever his motive was, he was pursuing the master's service—that of returning the car, tools, and crew to their appointed place, as

was his custom and duty; and while he pursued the service in an unauthorized and possibly forbidden way, he and those with him were during the time in the relation of servants to the appellant. Concede that in going off the employer's line he pursued a course which was beyond his authority; his purpose in doing so was nevertheless to accomplish an end within his employment, and reasonably, as he supposed, fitted to reach that end. . . . In this case it cannot be said that the servant had stepped aside from the master's service for a purpose of his own. The most that can be said of it is that, in accomplishing an end within the scope of his employment, he adopted a method wholly unauthorized, which was possibly resorted to to accommodate himself and those under him; but, whatever the motive may have been, since the end aimed at was, as averred in the complaint and as the judgment must have found, within the line of service, it cannot be said, upon the evidence, that he was acting without authority in a matter not connected with his employment." Note here, specially, that the court expressly held that, in all that he did, he was pursuing his master's service—that of returning the car, tools, and crew, as was his custom and duty; and whilst the method which he adopted might be unauthorized, yet what he was actually doing was within the master's service. And note this case is based upon the doctrine of *Quinn* v. *Powers,* both cases being cases of mere temporary deviation.

I have thus gone, case by case, over each of the authorities cited in support of the proposition that what the servant did in this case, in going away from the place where the chips were, to a distance of three miles, to the town of Waverly, and in returning therefrom, was work done in the master's business, and not a total departure from the master's business, or, to put it more strongly for appellant, was a mere case of deviation in the master's business, and not a case of total departure therefrom. If now one will specially note that in every one of these cases, with the possible exception of the case from the court of

civil appeals of Texas, the servant was uniformly engaged in the transaction of his master's business on the outgoing trip, and in the return therefrom merely deviated incidentally and temporarily, for some purpose of his own, but still whilst engaged in the performance of the master's business, I apprehend he will find it logically impossible to reconcile the reasoning and conclusion of my brethren in the case at bar with a single one of the authorities cited in support thereof. The boy took the cattle to pasture and returned the horse; the servant in the other cases delivered the ice or beer or goods or manure, or what not, and returned the vehicle to the master's home, and incidentally deviated for some business purpose of his own— to see his wife, to mend a shoe, to visit a friend, etc. Can it be seriously contended that the servant in the case at bar, leaving his territory for chips and splinters, and going three miles away therefrom, and in going doing absolutely nothing in the line of service to his master, but simply and merely carrying a sick man for accommodation, did not depart absolutely from his master's service? To my mind the conclusion is irresistible that the railroad company cannot be held liable for this injury on the first ground in the opinion of the majority.

Secondly, was the instrument—the railroad tricycle—a dangerous instrument, within the meaning of the rule of law on that subject? Undoubtedly there is a class of instrumentalities or appliances or agencies which are dangerous in themselves— inherently dangerous—concerning which two duties are imposed by law upon the servants of the master who have the custody of such instrumentalities or agencies. These two duties are, first, the duty of proper use of such agencies; and, second, the proper custody of such agencies. If one is injured either by the improper use of the agencies or by the agency itself, such injury resulting from careless custody, in either case the master is liable. In all the books and decisions the line of demarcation between such agencies and instrumentalities as are inherently dangerous and those which are not inherently dan-

gerous is well marked. Multitudes of decisions could be cited to show this line of demarcation, but the bar are familiar with the distinction. Amongst those which are thus inherently dangerous may be mentioned dynamite, gunpowder, torpedoes, electricity, and the like. Injuries may occur from the mere improper custody of such agencies as these, and in such case, since the master, in selecting agents to whom the custody of such agencies is intrusted, must be held responsible because of the fact that he cannot shift the responsibility of their careful and proper custody to the agent; the master himself must be held liable. And this liability is due directly not to negligence in the use of such agencies, but to the inherent character of such agencies, as dangerous. But there are many instrumentalities and agencies, the danger of which is not due to their inherent character, but to their negligent use; and in this latter class of agencies or instrumentalities the liability of the master must depend exclusively upon the single question of whether the agent, in their use, has been negligent. This, as I understand it, is the true and perfect distinction between the two classes of agencies or instrumentalities. This distinction is plainly pointed out in 1 Thompson on Negligence, sec. 523, where that learned authority says: "The railway company was under the duty of keeping the dangerous agencies carefully guarded. It committed this duty to its servants. It was not merely their duty to use them, but also to guard them; and for the failure of this duty the master was liable, on the footing of its being negligence within the scope of the employment of the servants." In this class of cases, as remarked by Justice Finch, "it will make no difference, in his liability, if the servant did so to effect some purpose of his own. In either case the master has committed to the servant the discharge of a duty which the law has imposed upon the master for the safety of third persons, and the servant has abandoned that duty; and this is enough to render the master liable, without any regard to the motive of the servant."

The case of *Erie Railroad Company* v. *Salisbury* (the push-car case) was a case in which six justices concurred and five dissented; and it is not, as I see it, a case belonging under the head of dangerous agencies. It is rested, as the opinion shows, upon the negligent use of the push car.

The distinction which I have adverted to is clearly drawn in the two following cases: In the first, cited by the majority— *Pittsburg* v. *Shields*, 24 N. E., 658, at p. 660 (8 L. R. A., 464, at p. 467; 21 Am. St. Rep., 840)—the court say, speaking of a hatchet: "A hatchet is not an instrument of danger, within the rule above stated. It includes only such instruments as are such within themselves. The danger of a hatchet is in the hand and the spirit of the man who may use it. If in this case the instrument left on the track had been a hatchet, the company would not have been liable to a child who might afterwards have picked it up and been injured by it; for the company would have been under no such duty as to its custody as it was under in regard to this dangerous explosive." In the case of *Loop* v. *Litchfield*, 42 N. Y., 358, 359 (1 Am. St. Rep., 513), treating the distinction I have above set out, the court say: "The appellants recognize the principle of this decision, and seek to bring their case within it by asserting that the fly wheel in question was a dangerous instrument. Poison is a dangerous substance. Gunpowder is the same. A torpedo is a dangerous instrument, as is a spring gun, a loaded rifle, or the like. They are instruments and articles in their nature calculated to do injury to mankind, and generally intended to accomplish that purpose. They are essentially and in their elements instruments of danger. Not so, however, an iron wheel, a few feet in diameter and a few inches in thickness, although one part may be weaker than another. If the article is abused by too long use or by applying too much weight or speed, an injury may occur, as it may from an ordinary carriage wheel, a wagon axle, or the common chair in which we sit. There is scarcely an object in art or nature from which an injury may not occur

under such circumstances. Yet they are not, in their nature, sources of danger; nor can they, with any regard to the accurate use of language, be called dangerous instruments. That an injury actually occurred by the breaking of a carriage axle, the failure of the carriage body, the falling to pieces of a chair or sofa, or the bursting of a fly wheel, does not in the least alter its character."

In the case at bar it seems perfectly clear to me that the injuries sustained by appellant were not due to any inherent danger in the tricycle, within the rule of law on that subject, but exclusively to the negligent use of the tricycle by Watson. It is impossible for me to understand how there could be any inherent danger in this tricycle. It does not, I hold, come within the rule applicable to dangerous agencies. The whole trouble here is not that the tricycle, because of any inherent dangerousness within itself, injured appellant, but simply and merely that this man Watson recklessly and willfully ran over the appellant with the tricycle. It is a case, therefore, on the second branch of the argument, of nothing else than the mere reckless and negligent use of an instrument in itself naturally harmless. The numerous cases where persons have been injured by carriages, vehicles of various kinds, mowing machines, and things of that sort, axes, hatchets, and the like, are all seen to be, when properly classified, cases where the injury was due merely to the negligent use of the particular thing, not to any inherent danger in the thing itself. In other words, we may say, broadly and distinguishingly, that the difference is between explosives and the like, as gunpowder, dynamite, torpedoes, electricity, etc., and other things. In the former the injury is due directly to the inherently dangerous character of the agency; in the latter, exclusively to the negligent use of the thing by some person—the thing being in itself not dangerous. A railroad tricycle is, in my judgment, plainly in the latter class.

I do not often dissent, making it a rule of my judicial life

not to dissent where the difference between myself and my brethren does not amount to conviction; but where that difference is so great as that it does amount to conviction, then I think it my duty to dissent. It amounts to conviction in this case, where I think the principle here stated fraught with great danger. With all deference to my brethren, I greatly fear that this decision will certainly return to plague the court, and have therefore felt constrained to set forth somewhat at large the reasons compelling me to dissent.