(94 Misc. Rep. 712)

## DOCKWEILER v. AMERICAN PIANO CO.

## DRAUGHTE· v. SAME.

(Supreme Court, Trial Term, New York County. April, 1916.)

1. MASTER AND SERVANT ⬅332(2)—INJURY TO THIRD PERSON—NEGLIGENCE OF SERVANT—SCOPE OF EMPLOYMENT—QUESTION FOR JURY.

Where, in a third person's action against an employer for injuries due to negligence of an employé, the facts are in dispute, or are susceptible of different inferences, the question whether the employé was acting in the course of and within the scope of his employment at the time of the accident is for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1275; Dec. Dig. ⬅332(2).]

2. MASTER AND SERVANT ⬅302(2)—INJURY TO THIRD PERSON—NEGLIGENCE OF SERVANT—IMPLIED AUTHORITY.

It is not essential to an employer's liability for injuries from the negligent operation of a van by his employé that the employé shall have had express authority to use the van as he was using it at the time of the accident, but it is sufficient if the nature of his employment and the duties incident thereto fairly raise an implication of such authority.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1218, 1219; Dec. Dig. ⬅302(2).]

3. MASTER AND SERVANT ⬅305—INJURY TO THIRD PERSON—COURSE OF EMPLOYMENT — "DEVIATION" — "TEMPORARY ABANDONMENT" — "COMPLETE ABANDONMENT."

In respect to the liability of an employer for injury to a third person through the negligence of an employé, there is a manifest distinction between "deviation," "temporary abandonment," and "complete abandonment" of the employment prior to the accident. In deviation, there is no severance of the agency, but merely an irregular method of performance. In cases of temporary abandonment, the relation of master and servant ceases so long as the abandonment continues, but reattaches when the service of the master is resumed. Complete abandonment wholly severs the relation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1223, 1224; Dec. Dig. ⬅305.

For other definitions, see Words and Phrases, First and Second Series, Abandonment; Temporary Abandonment.]

4. MASTER AND SERVANT ⬅332(1)—INJURY TO THIRD PERSON—NEGLIGENCE OF EMPLOYÉ—RESUMPTION OF EMPLOYMENT—QUESTION FOR JURY.

Where the driver of a van temporarily abandoned his employment to drink intoxicants with his companions, and thereafter started to take a van to the garage by way of his home, where he intended to stop for a

meal, according to his custom, and was at fault for a collision in the vicinity of his home, causing injury to plaintiff, the question whether he had resumed his employment with defendant at the time of the accident was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1274; Dec. Dig. ⚖=332(1).]

5. MASTER AND SERVANT ⚖=305—RESUMPTION OF EMPLOYMENT—WHAT CONSTITUTES.

Where there has been a temporary abandonment of an employment, the servant cannot ordinarily be said to have returned to his master's service until he at least reached a point in a zone within which his labors would have been consistent with an act of deviation merely, had the original act been such in its other circumstances as to have been one of deviation, and not one of temporary abandonment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1223, 1224; Dec. Dig. ⚖=305.]

Two actions, one by Joseph J. Dockweiler and the other by Anita Draughte, both against the American Piano Company. On motions for new trial after verdicts for plaintiffs. Motions denied.

Jesse W. Tobey, of New York City, for plaintiffs.
William A. Jones, of New York City, for defendant.

HOTCHKISS, J. The negligence of the chauffeur of the van is practically undisputed. The only question is whether the defendant is liable for the chauffeur's acts. The van was employed by the defendant for moving pianos. It was manned by a crew consisting of the chauffeur, Conklin, a foreman, Chalmers, and one or more helpers. The foreman received his delivery orders from a shipping clerk, but one Burke seems to have been a sort of general foreman. The crew's normal hours of service were from 8 a. m. to 7 p. m. The circumstances under which the work was performed were such as to make the hour and place when the day's work was ended both irregular and uncertain. Sometimes the work extended late into the night, and would be concluded at a point far distant from the garage, but at the conclusion of the day's labors it was the duty of the chauffeur to take the van to the garage on West Fifty-Second street, Manhattan. The chauffeur lived on Eighth avenue, near 130th street, Manhattan.

There was testimony to the effect that occasionally during the day, and to the knowledge of both Burke and Chalmers, when the van was in the vicinity of the home of Conklin, the chauffeur, the crew would get their meals where most convenient, while Conklin would go to his home for his, driving the van there for that purpose. Moreover, the circumstances under which the labors of the crew were performed were, I think, such as to justify a finding that if at the conclusion of the day, if the hour was then late and the van was in the vicinity of the chauffeur's home, but at such a distance from the garage as to unreasonably postpone the chauffeur's evening meal, were he to first take the van back to the garage, the chauffeur was impliedly authorized to drive the van to his home for the purpose of getting his meal and thereafter returning the van to the garage. The last delivery on the day of the accident was at No. 400 West 124th street. This was

about four miles from the garage, but not over three-quarters of a mile from the chauffeur's home. The work of delivery was finished at about 7:30 p. m. At this point there is a variance between the testimony of Chalmers and that of Conklin. Chalmers swore that Conklin said he was going to his home for dinner before going to the garage, and that he (Chalmers) said he would accompany the van that far. Conklin swore that Chalmers ordered him to take him to his (Chalmers') home in 154th street, borough of the Bronx. For reasons hereinafter stated I deem the variance immaterial.

There is practically no dispute about what was in fact done. The van was driven east on 124th street, where a stop was made at a saloon. Proceeding to the Bronx, the real objective point, the helper was let off at a subway station, and Chalmers and Conklin went on. They stopped at a saloon at 135th street, where two friends were picked up, and after regaling themselves for some time at this saloon they proceeded to Chalmers' home in the Bronx, where he was left. Returning, Conklin drove the van back to the saloon at 135th street, where his two friends left him, and where he drank again. Leaving 135th street with another friend, he drove south on Eighth avenue toward his home, which, he says, was his objective point from the time he left the Bronx; it being his intention to there get his dinner and then to return the car to the garage. Coming down Eighth avenue, he says that, because his attention was at the time diverted, he passed his home in the block between 130th and 129th streets, and because of the inconvenience involved in turning the van around he determined to go to his home by going around the block, and for this purpose turned west into 129th street and then north at the corner of St. Nicholas avenue, at which point, to wit, on the westerly side of St. Nicholas avenue, some 20 or 30 feet north of 129th street, the collision occurred. The hour was about 9:45 p. m. Reference to a city map will show that the place of the accident was at a point on a route which Conklin might well have taken, had he proceeded directly from No. 400 West 124th street to his home.

The jury were instructed that the circumstances negatived any express or implied authority in Chalmers, after the piano had been delivered in West 124th street, to direct Conklin to take him to his (Chalmers') home in the Bronx, and that the use of the car for that purpose was unauthorized. The jury were also instructed that the defendant could not be held liable unless at the time of the accident Conklin was performing a service for the defendant's benefit, and that if the accident occurred at a time when Conklin had departed from his duty, and while he had temporarily abandoned the same, and was still in the performance of some business or purpose of his own, defendant was not liable; also if, when the van left W. 124th street, Conklin entered upon the performance of some purpose of his own, or of Chalmers, but with the intention, when these personal purposes were served, to return to the performance of his duty to the defendant, and if, in fact, the accident happened at a time when he had so returned to the defendant's service, then his acts in the interval might be regarded as a temporary abandonment only, and the jury would be justified in finding defendant liable.

In substance the following questions were left to the jury: (1) Had Conklin implied authority to go to his home for dinner before he returned the van to the garage and to use the van for that purpose? (2) When the van left 124th street had those in charge thereof abandoned the purpose to serve the defendant, and was Conklin still in pursuit of his own purposes at the time of the accident, or did the trip to the Bronx constitute no more than a temporary abandonment of the defendant's service, and at the time of the accident was Conklin on his way to his home, and had he thus returned to the service of the defendant? The verdict determined these questions in plaintiff's favor.

[1-4] Where the facts are in dispute, or are susceptible of different inferences, the question whether or not the employé was acting in the course and within the scope of his employment is for the jury. Reilly v. Connable, 214 N. Y. 586, 108 N. E. 853, L. R. A. 1916A, 954, Ann. Cas. 1916A, 656. The primary test of the defendant's liability is whether at the time of the accident Conklin was using the van within the scope of his employment. Express authority is not essential. It is sufficient if the nature of his employment and the duties incident thereto are, under the circumstances disclosed, such as to fairly raise an implication of authority. Nor would mere disobedience of express or implied instructions, such as deviation from a customary or direct route, of itself be sufficient to destroy the agency and thus free the defendant from responsibility. Reilly v. Connable, supra; Quinn v. Power, 87 N. Y. 535, 41 Am. Rep. 392; Cosgrove v. Ogden, 49 N. Y. 255, 10 Am. Rep. 361; Jones v. Weigand, 134 App. Div. 644, 119 N. Y. Supp. 441. The authorities point to a manifest distinction between deviation, temporary abandonment, and complete abandonment. In deviation there is no cessation of the agency, but merely an irregular method of performance. Quinn v. Power; Jones v. Weigand, supra. In cases of temporary abandonment the relation of master and servant ceases so long as the abandonment continues, but reattaches when the service of the master is resumed. Geraty v. Nat. Ice Co., 16 App. Div. 180, 44 N. Y. Supp. 659. Complete abandonment wholly severs the relation. Reilly v. Connable, supra.

The principles of law to be applied are well settled; the difficulty arises in determining the controlling fact. If the accident had occurred while the van was being driven from 124th street to Conklin's home for the purpose of his getting his dinner, even though the route taken might not have been the most direct, the case would have been one of deviation, and the defendant's liability could scarcely be questioned. Jones v. Weigand, supra. In cases of temporary abandonment, such as the present, the difficulty is to determine at what moment the service of the master was resumed. Is resumption a mere mental operation, proven or corroborated by the facts, or is it controlled by elements of time and place reasonably coinciding with the line of original duty? I think that liability must be determined by a combination of both propositions. Necessarily there may be material considerations of time and place which have no application in this case. The time and place of resumption must have some reasonable relation to the character of the regular duty or service. See Fleischner v. Dur-

gin, 207 Mass. 435, 93 N. E. 801, 33 L. R. A. (N. S.) 79, 20 Ann. Cas. 1291; Ritchie v. Waller, 63 Conn. 155, 28 Atl. 29, 27 L. R. A. 161, 38 Am. St. Rep. 361. If when the van left 124th street, it had been taken to Albany on a "frolic," and if Conklin had then returned back with the intention to take the van to the garage, but to stop for some meal at his home on the way, and if the accident had happened on the way back from Albany, but at a point distant from this city, or had it happened at or near the vicinity of Conklin's home, but at a time so long after his departure from 124th street as to preclude the presumption that defendant would regard him as still in its general employ, it could scarcely be said that the abandonment evidenced by the trip to Albany had been concluded and the service of the master resumed.

Here neither the remoteness of time nor of place was such as to make it improper for the jury to find that at the time of the accident Conklin had not been guilty of any act which presumptively constituted his voluntary discharge from defendant's employ, and that the van was not then being used in the service of the defendant. The general doctrine is discussed by Labatt (volume 6, §§ 2294–2302), where the authorities are digested and grouped according to the respective and differentiating points of view. One of the most thoroughly argued cases on the subject is Barmore v. Vicksburgh, Shreveport & Pacific R. Co., 85 Miss. 426, 38 South. 210, 70 L. R. A. 627, 3 Ann. Cas. 594; in which Geraty v. Nat. Ice Co., 16 App. Div. 174, 44 N. Y. Supp. 659, is cited to sustain the proposition that (85 Miss. 443, 444, 38 South. 314 [70 L. R. A. 627, 3 Ann. Cas. 594]):

"If the act which the servant was engaged in at the time of the injury was one which, if continued until its completion, would have furthered the master's business and been within the scope of the servant's employment, the master would be liable, even though the act occurred at a place to which his duty did not necessarily call him."

In the Barmore Case, Watson, an employé of a railroad, whose duty it was to attend to a steam pump, was furnished with a railroad tricycle, which he used to gather kindling along the right of way. Watson went to a spot where kindling was plentiful, but after reaching that spot proceeded to carry a sick friend on the tricycle to a station beyond, and while returning, but before reaching the point at which he had deviated from his employment, negligently injured the plaintiff. Writing for a majority of the court, Truly, J., in the course of his opinion said (85 Miss. 444, 445, 38 South. 212 [70 L. R. A. 627, 3 Ann. Cas. 594]):

"When did Watson resume his service, so as to render his master liable? His private affair was to carry a sick friend to the station, but when that was completed, and he began to propel the railroad tricycle back over the route which he had previously traveled, with the intention and for the purpose of proceeding to the discharge of the duty which he was employed to perform, he then resumed his master's service, which had been suspended temporarily while he was engaged about his own affairs. The argument that Watson did not resume his duty until he actually reached the spot where he was to gather the fuel rests on no solid legal foundation. He was operating the appliance which it was his duty to operate. He was on the track at a place which he was compelled to pass over, and proceeding to the place where

his duty called, for the purpose of performing that duty, and was at the time of the injury engaged about no affair of his own, but discharging in the usual and customary manner the business for which he was employed. Under such circumstances the master is answerable for the tort of the servant. We hold, in cases where the servant has made a temporary departure from the service of the master that when the object of that departure has been accomplished and the servant re-engages in the discharge of his duty, the responsibility of the master instantly attaches. Any other conclusion would leave us without any definite rule, in cases of temporary abandonment of duty, to determine when the servant re-entered the scope of his employment."

It is true that in the Barmore Case there was a strong dissenting opinion by Whitfield, C. J.; but, with one limitation I prefer the reasoning of the majority, which I think is in accord with the weight of authority and with the principles of liability which have been adopted in this state. The limitation I would attach to the quoted portion of the opinion in the Barmore Case is this: The learned court said, when "the servant re-engages in the discharge of his duty, the responsibility of the master instantly attaches." Read technically, the proposition in the words in which it is stated is incontestably sound. But if it is to be construed to mean that, regardless of time or place and their relation to the prescribed duty of the servant or the place of its normal performance, the moment the servant ceases the pursuit of his own purposes, in which pursuit the abandonment consists, and turns with the intent to resume the service of his master when he shall have reached its customary place or route of performance, at that moment he must, as matter of law, be held to have returned to his master's service, I would dissent.

[5] Where there has been a temporary abandonment, I think the servant cannot ordinarily be said to have returned to his master's service until he has, compatible with his regular or lawful duties, or, at least, reached a point in a zone within which his labors would have been consistent with an act of deviation merely had the original act been such in its other circumstances as to have been one of deviation, and not one of temporary abandonment. This I take it was the actual decision in the Barmore Case, and was the principle of the decision in Geraty v. Nat. Ice Co., supra. It is controlling in the case at bar.

Motions for new trial denied.