This is an action for damages for personal injury, claimed by plaintiff to have been proximately caused by the negligence of the defendant.
There was a demurrer to the complaint on the ground that it did not state a cause of action, which was overruled, and on appeal to this court in Kutchera v. Minneapolis, St. P. S. Ste. M.R. Co. 50 N.D. 597, 197 N.W. 140, this court in affirming the order overruling the demurrer pointed out specifically the allegations in the complaint which stated a cause of action, and which is necessary to refer to in this opinion for a thorough understanding of the contentions of the parties.
It is alleged that in October, 1921, the defendant engaged the plaintiff to overhaul and repair the gasoline engine of a certain gasoline propelled vehicle suitable for travel on railway rails; that the machine was taken to the plaintiff's place of business for overhauling and repairing the engine; that upon examination and overhauling said engine, plaintiff determined and found that it would be advisable to try out and test it by operating the machine upon the railroad tracks of the defendant; that the plaintiff transported the machine to the railroad and asked defendant for and received authority to test the engine by operating the speeder upon the tracks; that it was a dangerous, treacherous machine to operate and, on account of the nature of its construction, would not hold to the track. It was alleged that it would without warning jump off the rails, which was known to the defendant and unknown to the plaintiff, and the defendant carelessly and wantonly failed and neglected to give notice to the plaintiff of such danger; that the plaintiff operated the machine a short distance on the track of the defendant, and while the plaintiff and an employee were sitting upon said speeder, operating and running the same in the usual manner the wheels without fault on the part of the plaintiff or his employee jumped off the rails of said track, thereby causing the plaintiff to be thrown from his seat and causing the injuries complained of, without plaintiff's fault and without the fault of his employee.
In determining whether the allegations stated a cause of action, the court said:
"Plaintiff was not employed to repair the tricycle, but to overhaul the engine. The work of overhauling the engine was apparently completed. The engine was separable from the speeder. If the injury *Page 902 
resulted proximately and solely from the negligent manner in which the repair work was done, or from an act which was a necessary incident of the work, the defendant would not be liable. Note 65 L.R.A. 641. There is nothing in the complaint from which we are justified in drawing this inference, as a matter of law. It is true, the complaint says that plaintiff `determined and found that it would be advisable to try out and test the said engine by operating the said speeder upon the railway tracks,' but it is not alleged that it was essential to a proper repair job that the tricycle be in fact operated on the tracks. We think the allegations of the complaint, fairly construed, show that the dangerous characteristic, to wit, a tendency to jump the track, was due to the construction of the tricycle, entirely apart from the engine with which it was equipped and which plaintiff had fully repaired when the injury occurred. . . .
". . . There is no allegation in the complaint that there was any specific defect in the machine; it is not claimed that any part of it was worn, broken, or in any respect defective; the contention is simply that the entire machine, though all its parts were sound and in functioning condition, was, nevertheless, a dangerous instrumentality when operated upon railroad tracks. We think it is a sound rule of law, as well as good sense, that he who puts a thing in charge of another, which he knows to be dangerous or to be possessed of characteristics, which, in the ordinary course of events, are likely to produce injury, owes a duty to such person to give reasonable warning or notice of such danger."
"It was being operated," the complaint says, "in the usual manner." The theory of the court in construing the complaint is that if the plaintiff had completed his work in fully repairing the engine, the operation of the machine upon the tracks was no part of the work which plaintiff was employed to do; his work was completed when the engine was repaired. But if the machine was fully repaired, and it was not necessary to try it on the tracks as a part of the plaintiff's employment, and the plaintiff did operate said machine upon said tracks in the usual manner and without negligence upon his part and there was an injury proximately caused by an inherent defect in the machine itself, separate and aside from the engine which had been fully repaired, which inherent defect was known to the defendant and unknown to *Page 903 
the plaintiff, the defendant would be liable for not giving notice to the plaintiff of such inherent defect.
The defendant answered, alleging that the plaintiff conducted a machine shop and foundry in the city of Bismarck and held himself out to the public and to the defendant as an expert machinist; that the defendant engaged the plaintiff to make certain repairs on a gasoline engine; that the plaintiff took said engine to his machine shop to repair the same, using his own methods and ideas, furnished his own assistants, and took his own time in making such repairs in accordance with certain instructions from the defendant, as to repairs to be made; in the making of such repairs the plaintiff was an independent contractor. Defendant denied negligence and pleaded contributory negligence and the assumption of the risks.
The case was tried and the jury returned a verdict in favor of the plaintiff for the sum of $12,048.60. The defendant moved for a judgment notwithstanding the verdict, or in the alternative for a new trial. The motions were overruled and the defendant appeals.
It appears in the evidence that one Adelbert Birdsell was in the month of October an assistant engineer inspecting bridges and culverts and that he used a gasoline car. He states: "I had trouble with the engine both the ignition and compression. Various automobile mechanics along the line were unable to find what the trouble was. When I got to Wishek I wired the agent at Bismarck asking him if repairs could be made in our shops at Bismarck. Mr. Thompson answered that repairs could be made in a private machine shop. I disconnected the car, took the two guide wheels and the tray off, took out the gasoline and shipped it to Bismarck. When I got to Bismarck Mr. Thompson took me over to Mr. Kutchera's and I told him (Mr. Kutchera) about the car as near as I could describe what I thought was the trouble. He had never seen anything of that kind, but as long as it was a gasoline engine he thought he could fix it. I arranged with him to get the car when it came in and see if he could determine what was wrong and if he could, to make repairs, and that I would call for the car the following week. I named the day and told him if the repairs had been made at that time I would try it out and see if it was all right. I returned the following week on the day that I said I would. I went over to the shop as soon as I got off the train to see if he had made the repairs *Page 904 
to the car and was told that he had just taken the car over to the Soo tracks to try it out. I went over there to see what he was doing. I saw the section crew coming and walked down and met them in front of the car house; they had Mr. Kutchera on the car." There are file marks on the cross rods connecting the wheels, and when the file marks are just underneath or at the edge of an eye bolt, the wheels are in alignment.
Mr. Kutchera knew that he was dealing with Birdsell; on page 41 of the record Mr. Kutchera says: "It was said that the engine wasn't going right and that they had it at different places, tried to have it fixed, and they weren't successful in it, and they was going to bring it down to us and Mr. Thompson recommended him to us, or recommended us to him, that we were able to fix the engine." He repeats: "He recommended us to him, I don't know exactly which way it was." "Q. As an expert to fix the car? A. Yes. Q. The engine on it? A. Yes." On page 5 of the record, he says: "Mr. Thompson and another man came down to our place of business and said that the Soo Railroad Company had a gasoline speeder with an engine not working right and that this man that was with him operated the speeder for them, for the Soo Railroad Co., and he had an awful lot of trouble with the engine and he tried to have it fixed at different places along the line and didn't have much success with it, and he brought him down to my place of business and said it was a pretty good place to have it fixed, and he thought if we couldn't fix it it couldn't be fixed, and he asked me if we thought we could take the job, and I said `Yes.'"
Mr. Thompson states: "I introduced this gentleman, and stated to Mr. Kutchera as near as I can recall, that he had a motor car and was having some trouble with it and that I was sure that Adolph Kutchera would be able to remedy the trouble." He did not say anything as to what work Kutchera should do. Thompson had not seen the car at that time. Thompson had no knowledge of the operation of motor driven cars or of their construction or design. He had seen them, that's all; he had never operated one. When the car was received at the station, Thompson notified Mr. Kutchera that the car was there and for him to get it and have it repaired so that it would be ready for Mr. Birdsell when he returned.
Mr. Kutchera states that Mr. Thompson did come and asked if we *Page 905 
forgot the speeder, and we said, "we are going to go right at it." Mr. Thompson said the speeder was at the Soo freight house, and two of my men took a truck and went down to the freight depot and brought part of the speeder down to our shop. The engine was all that needed repairing. When it was brought down to our place of business we just looked it over, looked over the ignition and gasoline, and things like that, to get it in shape to start, see if she starts or what is the matter with it. We started up the engine and run the engine, we couldn't hardly decide the trouble of it, the engine was running but she was just idling, but we couldn't put it under any load or any pulling. We decided we ought to try it out right on the tracks where they were going to use it, and we thought the only way to determine what the trouble was, was to try it out in actual use. Previous to this time I had not repaired a speeder such as this speeder was. No, sir, only the engine part, of course. I had never operated a three-wheeled speeder. Nothing was said about anything being wrong except with the engine. Mr. Zavalney and I took the truck and loaded the part of the speeder we had down at the shop and drove down to the Soo freight depot and we went to the office and I told Mr. Thompson that we looked over the engine as much as we could and we couldn't find the trouble unless we put it to work, and I said that we should have to ask for permission to use the tracks to try it on. Mr. Thompson said, "There is going to be a train coming in inside of an hour and a half from the north," and he said we shouldn't take the main tracks, and I said it wouldn't take us no hour and a half, maybe only ten or fifteen minutes or a half hour. "Well," he said, "then go ahead, it doesn't make any difference." We went into the warehouse, took that third wheel out and attached it to the speeder and put it on the track on the 9th street crossing. It was a vehicle with two wheels running on one track, and one on the other track, driven by a two cylinder engine, propelled direct to one of the wheels of the two that was running on that same rail, and I guess that is about all I can explain. It was made I guess for two persons to sit on, the three wheels was held by a brace with bolts and nuts and straps fastened to it. The braces were made of iron as much as I remember. Zavalney and I put it together; I got on the speeder, Zavalney pushed the speeder until the engine started and then he got on. We drove a little past the penitentiary brick yard, I *Page 906 
think it must be a little better than two miles all together. I think we went beyond the brick yard, there is a curve to the left going north. The engine kept missing, didn't fire regularly and then we had a wind towards us; we were afraid to go any further on account of that we might have to push it back. We did not turn the machine around, we reversed the engine and the sparks; Zavalney pushed it until it started and then he got on; he pushed it maybe ten, fifteen, maybe twenty-five feet. I noticed Zavalney reaching down; I guess he must have tried to adjust the carburetor or something; he did that coming out too. I don't remember anything after that. It did not go more than a block. I do not know how it happened. Mr. Thompson came to the hospital to see me quite often, he asked me how fast I went; that is mostly what he asked me while I was up there. He asked me the same before, how fast I went, he tried to make me say I went fast, and because he asked me that same question so often I got sore about it and I told him he could figure that out himself as the accident happened after we went only for a block or so, for a short distance with a poor running engine. I said that is easy enough for him to figure out himself, if he considers the short distance we were from the place we started, with a poor running engine, and of course he seen he didn't ask the right question. He said, "Well, of course, I expected that something may happen to you because that thing jumped the track quite often before, a good many times before." I think this was on the last visit; my wife and Mr. Zavalney was present at the time; Mr. Thompson was alone.
Mr. Zavalney who was with Mr. Kutchera says that when they went to see Mr. Thompson about using the track. I stopped in the doorway behind the door, which was open a little, I stood outside. He asked him if we could try the car on the track, and Mr. Thompson, I just barely heard him say "Yes, you could have the main track or else a side track, there will be a train in about an hour or an hour and a half." Mr. Kutchera said, "We don't need that much time." We had no trouble except from the engine, we drove the other side of the brick yard, and there is a curve there going north. We drove to the other side of the curve and then started back south. I pushed not very far, I got on the car and reached for the carburetor. I was adjusting the carburetor and that is all I know. It may have gone a city block from where we started. I saw Mr. Thompson in Mr. Kutchera's room at *Page 907 
the hospital Mrs. Kutchera was there, I was there and Mr. Thompson come in and he was talking to Mr. Kutchera about how fast he went or something, I don't know what he was telling, but he said: "I know there were danger, it happened to us before with the same kind of speeder."
On cross-examination Mr. Kutchera states that he learned the machine business in Austria, and is an expert machinist with gasoline engines, makes parts for machines, makes whole machines, repairs threshing engines, automobiles, every kind of a machine, and is an expert in repairing gasoline engines and all machinery in general and had been doing such work in Bismarck since 1911. "There was no instructions, all they ever said was that the engine was giving them trouble and they wanted it fixed. Mr. Thompson told me that this man that was with him was the fellow that was using it. We looked the engine over and then we went down to the depot and got the rest of the car. I am pretty sure that I did handle it myself. I did not know the make of the car. Mr. Zavalney and I put it together, we both together done it. I never put a car together of that kind. We just fastened on the braces that was off, and screwed it together." Q. "Well you didn't know whether you had the right distance between the wheels?" A. "We did not." Q. "You did not know what markings were on the car to determine that distance?" A. "No, we put the three wheels on with part of the axle that was left there and the brace, put a few burrs and clamps on it, just what had been taken off, nobody showed us how to put it together, I never put a car of that type together before. I did not see a bushing brace block hanging on the frame work of the car, I don't know whether one was there or not, we didn't put such bushing brace block back in its proper place that I know of." Q. "And do you know how to adjust the wheels of those cars so they will have the proper toeing in and toeing out?" A. "I never had anything to do with anything like that. I put the car together and run it. I don't know how fast the manufacturer intended it should run, to the best of my knowledge I thought it would go either way. I don't know anything about the operation of the car. In going out we both done our part of running it. I was sitting there, and there really wasn't much to do only start it and then find out what she does; nobody gave me any instructions. I don't know whether we run it in the usual and *Page 908 
customary manner or not, I don't know which is the front end of the car. I don't know that those cars are not intended to be run backwards or what they are intended for." Q. "And still you assumed to run the car?" A."Well they had confidence in me. Yes I operated the car, Zavalney pushed the car, got on it and adjusted the carburetor." Q. "Did Mr. Thompson tell you to use the south side track if you wanted to use any?" A. "Yes he said that first." Q. "But you used the main line?" A. "Yes."
Mr. Zavalney further states that at the time of the accident "it wasn't going very fast and it wasn't so slow, and a block isn't such a long distance and it wasn't going very fast, maybe ten, maybe fifteen, I don't know. I was working for Kutchera, I did what he told me to do. Going out I drove the car, we both manipulated the lever that controlled the flow of gasoline, coming back I believe I manipulated the levers or else Mr. Kutchera, I think I did, I am not very sure. We both was there both doing a part. Nothing about the speeder was broken that I know of. I do not know what make of car, or the name of the manufacturer. I never put a car of that kind together before." Q. "What did you do so as to get the alignment of the wheels right, so they wouldn't climb the rails?" A. "You cannot miss them." Q. "Well did you do anything to get them aligned?" A. "No." Q. "Did you ever operate a speeder or motor car of this kind before on the track?" A. "No, sir. I don't know how fast it is intended to run, or whether the manufacturer expected the car would run backwards as well as forwards. No one showed me how to put the car together. That was my first experience in putting together a car of that kind." Q. "Now, isn't it a fact that that car had four wheels on it? You needn't make eyes, Mr. Zavalney, just answer my question please, I am not joking." A. "I said it was three, it seems to me three." Q. "Now, I asked you if there wasn't four wheels?" Mr. Cox: "The witness has answered the question, your Honor, several times, to the best of his ability." Mr. Dullam: "He said the last time that it seemed to him it had three." The Court: "Answer the question." A. "Yes, three wheels." Q. "Didn't that car have four wheels?" Mr. Cox: "We object to that as useless repetition, and an attempt to bulldoze the witness." A. "Three wheels." Q. "Didn't that car have four wheels?" Mr. Cox: "Objected to as repetition and an attempt to bulldoze the *Page 909 
witness." The Court: "Answer the question, did it have four?" A. `No, it seems to me it had three wheels." Q. "That is just your best recollection?" A. "It had three wheels as much as I remember." The section foreman testifies that "after the car left the rails it marked the ties the length of two rails." From this testimony it is clear that the vehicle was not dangerous when received by the plaintiff. It had been taken apart by Birdsell, the gasoline taken out, and that part of the car containing the engine was all that was necessary, and all that was taken by the plaintiff to his shop.
Birdsell went out to the scene of the accident on the same day, and with the aid of another man put the car back on the rails and brought it in. He testified: "There is a brace block that sits on top of the cross piece that connects the four wheels together underneath the seat on the outside; that is loose and has to be taken care of when the car is taken apart. I tied it on to the frame work of the two guide wheels with a piece of heavy twine. I saw that piece when the car was brought into Bismarck after the accident. It was still tied in the same position where I placed it at Wishek when I took it apart. I understand putting it together; there is a file mark on the cross rods or frame that connects the four wheels together, and when that file mark is just showing underneath at the edge of an eye bolt then the wheels are in alignment."
In reference to the conversation at the depot before the accident, Mr. Thompson says "they came to the office the same day they had removed the car or the day following and said something about it being necessary to try the car out on the tracks. They wanted to try the car by putting it together, I presume, and see how it would operate on the railroad track. I told them that the only track he could use the car on would be a side track, a south track from ninth street parallel with Main street down towards the stockyards. My reason for limiting him to that track is that I had no authority on the main line of the railroad." I went to see Mr. Kutchera in the hospital; I did talk to him about the accident; I sympathized with him. I certainly did not tell him that this car had frequently jumped the track before. On cross-examination he said, "They did come and ask for permission to operate the speeder on the track and I told them they might operate it on the south track." I know I never said that the machine had jumped the *Page 910 
track on other times; I am positive of that, because I had never seen the car and it would be hearsay if I had. I couldn't say that I ever heard of a speeder such as the one Mr. Kutchera was using of jumping the track. "I might have heard; it is probably I may have read it somewhere." Q. "Well, it is barely possible, however, that during the course of that conversation such a remark as that might have been made by you?" A. "It may have and it may not. We may have talked about general things."
The only dispute in the testimony is as regards the conversation between Mr. Thompson and Mr. Kutchera in the depot and at the hospital. According to our view the conflict in the testimony over the conversation at the depot is immaterial. The plaintiff very clearly states that his action is not based on the use of the track but is based solely upon the failure of the defendant to notify the plaintiff that the machine was liable to jump the track when operated in the usual manner.
There was objection to Kutchera's testimony at the hospital that Thompson told him that that thing jumped the track often before, on the ground that the same was immaterial. Respondent claims, however, that if it was not competent it was material and relies on the case of Yarbrough v. Wisconsin Lumber Co. ___ Mo. App. ___, 211 S.W. 713, in which it was held "competent for the plaintiff to testify that the defendant's foreman told him just after the accident that he knew that the ring which broke was worn, and that he was intending to put in a new one, but had delayed doing so. . . . This evidence is competent to show defendant's knowledge of the defect a sufficient length of time before the accident to have repaired the same. . . . It was not competent, however, to show defendant's negligence, as this declaration or admission of defendant's foreman was not part of the res gestæ and not binding on the defendant." The statement made by the foreman to the plaintiff was held not sufficient as an admission of negligence, although he was the foreman in charge, knew that the ring was badly worn, and was intending to put in a new one and delayed doing so. It was only because defendant itself in that case proved these same facts on the trial by the same foreman who had made the admissions that it was held bound by the foreman's testimony, the court saying: "It is also true that plaintiff failed to make a case by his evidence, but *Page 911 
the defendant's witness, the foreman and superintendent testified fully, as to the parts of the machinery, and what ring it was that broke and caused the accident and thus supplied the testimony necessary to make a case."
The respondent also cites Lemen v. Kansas City Southern R. Co. 151 Mo. App. 511, 132 S.W. 13, in support of the contention that this testimony was competent. The precise question presented in that case was whether "evidence to show that pursuant to a custom to report fires to the nearest station agent, the conductor of the train did notify the agent at the next station that there was a fire up the road, and that the section gang should be sent up as far as the bridge." The court ruled that this evidence was admissible on the ground that "the conductor, in reporting the fire and in advising the station agent to send men to fight it, was acting in performance of a duty the defendant owed plaintiff" and his report was evidence in the nature of an admission. In the opinion in that case, however, the court said:
"It (the statement of the conductor) could not be of the res gestae because it was not a spontaneous utterance made at the time of the happening of the event, but was a mere historical recital made after an opportunity for reflection had been afforded the narrator. (Citation of authorities.) It could not be considered as an admission of the defendant since `the admission or declaration of his agent binds the principal only when it is made during the continuance of the agency in regard to the transaction then depending.' Redmon v. Metropolitan Street R. Co. 185 Mo. 1, 105 Am. St. Rep. 558, 84 S.W. 26. And the mere recital by an agent to his principal of a `mischief that is past and gone' has no evidentiary value in an issue between the principal and a third person. As to an issue of that character it is hearsay."
In the instant case the admission claimed to have been made by Thompson days after the accident was by no possible construction a part of the res gestæ. The "transaction," — the attempt to repair the speeder, the use of the tracks and the accident —, was no longer "depending" when Thompson is said to have made the statements at the hospital.
Dupont Engineering Co. v. Blair, 129 Va. 423, 106 S.E. 328, is relied on by the plaintiff. In that case the plaintiff testified that one Miller was the chief safety man for the whole plant. Miller stated to *Page 912 
the doctor at the hospital in the presence of the plaintiff: "We have had a great deal of trouble with that machinery." This admission of the agent was held admissible, although made after the accident, only because Miller "was present at the hospital in connection with plaintiff's injury in the regular course of his business." In that case Miller was still engaged in the "regular course of his business" when the statement was made. By no stretch of the imagination can it be said that Thompson was still engaged in the master's business when it is claimed he made the admissions to Kutchera.
The case of Barmore v. Vicksburg, S. P.R. Co. 85 Miss. 426, 70 L.R.A. 628, 38 So. 210, 3 Ann. Cas. 594, relied on by plaintiff, is not in point. The defendant in that case had furnished a tricycle to its servant whose services were not regulated by any superior, but left to his own judgment. He negligently injured the appellant. The case did not involve an inherent defect in the tricycle but whether the principal was liable for the negligent use by the employee of a dangerous instrumentality intrusted to him by it.
The statement of Thompson at the hospital, coming at the time made, does not prove negligence within the terms of plaintiff's own cited authorities, as we think a careful consideration will show. According to Kutchera, Thompson said: "Well, of course, I expected that something may happen to you because that thing jumped the track quite often before, a good many times before." And according to Zavalney Thompson said, on the same occasion: "I know there were danger. It happened to us before with the same kind of speeder." Whatever the statement was, it is undisputed that it was made sometime after the plaintiff's injuries were sustained and on the occasion of Thompson's last visit to the hospital. The statement is not offered to prove the state of Thompson's knowledge at the time the statement itself was made, or at any subsequent time, but to prove the state of his knowledge as to the dangerous character of the speeder in question at the time permission was given to try it out on the track.
Since it was not offered to prove a contemporaneous state of knowledge but knowledge at a prior time, to be admissible, the statement must be regarded as (1) a circumstance tending to prove that prior state of knowledge; or (2) it must be the admission of an agent having authority to bind the principal in the matter concerning which the admission *Page 913 
is made; or (3) it must be so closely connected in point of time as to be considered a part of the transaction in connection with which the knowledge is a material circumstance. We think the second and third hypotheses are so clearly eliminated under the record that no further attention need be paid to them. The admissibility of the statement, considered as a declaration of the state of Thompson's knowledge at a time prior to the declaration itself, depends then upon whether it evidences a state of knowledge at the time to which it refers as a sort of a verbal act, or whether it is a mere unsworn, extrajudicial statement, the evidentiary value of which depends wholly upon the truth or falsity of its contents. If the statement be true, Thompson had the knowledge which the statement attributes to him; if it be false, he had not that knowledge, so far as this record shows. The mere making of the statement, aside from its truth or falsity, would not evidence a state of knowledge as of the prior time. There being nothing in the statement itself, aside from its reliability as a narrative of a prior state of knowledge, to indicate whether or not Thompson at the time he gave the permission to use the track knew of the dangerous character of the speeder, the evidentiary value of the statement must depend wholly upon the truth of that which is stated. In these circumstances we are clearly of the opinion that the statement is, as to the defendant, merely hearsay evidence of Thompson's prior knowledge. If Thompson were sworn as a witness for the plaintiff and would testify under oath that on or about the 6th of October and prior thereto he knew that speeders of the character in question were dangerous in that they were apt to jump the track, he would draw upon his own present testimonial knowledge as to the state of his prior knowledge. On the other hand, had he made a statement to the same effect outside of court and in circumstances where he was not acting for the defendant, one hearing the statement and attempting to testify to it would not be presenting direct evidence of Thompson's state of knowledge on or about October 6th, but evidence as to what Thompson had said his knowledge was at the prior time.
On this question authoritative cases strictly in point are not to be readily found, but the principle, in our opinion, is clear. Says Wigmore (Wigmore, Ev. 2d ed. § 1766): ". . . The theory of the hearsay rule is that, when a human utterance is offered as evidence of *Page 914 
the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand subject to the test of cross-examination." And an alternative is also stated to the following effect: "If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, butwithout reference to the truth of the matter asserted, the hearsay rule does not apply. . . ." Clearly, the statement in question is valueless aside from the truth of the matter asserted. Elsewhere the same author says (§ 1788): "The hearsay rule forbids merely the use of an extrajudicial utterance as an assertion to evidence the fact asserted. Such a use would be testimonial, i.e., we should be asked to believe the fact because Doe (Thompson) asserted it to be true, precisely as we should be asked to believe Doe's (Thompson's) similar assertions if made on the stand. What the hearsay rule forbids is the use of testimonial evidence — i.e., assertions — uttered not under cross-examination. If, then, an utterance can be used as circumstantial evidence, i.e., without inferring from it as an assertion to the fact asserted, the hearsay rule does not oppose any barrier, because it is not applicable." "Again," says the same author in another connection (§ 265), "When a person's utterances are offered as indicating his knowledge of a fact mentioned by him, the utterance may circumstantially reveal the factum probandum, his knowledge; yet the utterance cannot be used as an assertion, to evidence the truth of the fact asserted, because the hearsay rule forbids; and thus it is necessary constantly to discriminate between the circumstantial and the testimonial use of such utterances." Here the fact asserted in Thompson's statement is the fact of his prior knowledge and, as previously stated, aside from his assertion of this fact, the statement is worthless as an indication of that prior knowledge. In our opinion, it comes directly with the hearsay rule. What is said upon this subject is said in light of the fact that there may be another trial of the action. We make no holding as to whether or not the objection that the evidence was immaterial was sufficient.
It is urged by the appellant that the evidence fails to show whether or not the accident was due to the claimed inherent defects or dangerous quality of the tricycle when operated in the usual manner as alleged, or whether it happened through improper operation of the tricycle, *Page 915 
or because it may have been improperly put together by the plaintiff preparatory to its operation upon the railway tracks. It is of course incumbent upon the plaintiff to eliminate by evidence all question that the accident was due to improper operation or to the faulty manner in which the tricycle was put together. In other words, the burden is upon the plaintiff to establish that the defendant's negligence was the proximate cause of the accident. It must be borne in mind that under the evidence the plaintiff assumed sole charge of putting the speeder together although, confessedly, being wholly inexperienced in this matter. It must also be borne in mind that neither he nor his assistant professed any degree of knowledge as to the manner in which it was operated at the time, save that it was operated backwards. The record otherwise shows that three-wheeled speeders are not, on account of the alignment of the wheels, constructed to be operated backwards at all, and, consequently, the evidence is insufficient to establish that the plaintiff was operating the car in the usual manner. A majority of the members of the court are of the opinion that the plaintiff has not satisfactorily met the burden of showing that the negligence of the defendant was the proximate cause of the injury and that the evidence does not eliminate the other possible or probable causes that are so largely traceable to the acts or the inexperience of the plaintiff.
Upon this appeal it is argued that the lower court erred in not granting the plaintiff's motion for a new trial based, in part, upon the insufficiency of the evidence. In connection with that argument, the appellant stresses a large amount of so-called newly discovered evidence bearing upon the question as to whether the speeder was of the three-wheeled or four-wheeled variety. Counsel for the respondent, in our opinion, very properly urges that, in so far as the appellant seeks a new trial upon the ground of newly discovered evidence concerning the number of wheels upon the speeder, the motion is entirely without merit. This case, as previously appears herein, was long pending in the district court before trial. The original complaint alleged specifically that the speeder upon which the plaintiff was injured was a three-wheeled speeder. Depositions were taken before the trial in which the dangerous quality of three-wheeled speeders was the principal subject of inquiry. In the light of this frank statement of the plaintiff's position, *Page 916 
it is difficult to conceive of any adequate excuse for the defendant's refraining from marshalling all available evidence that the speeder in question really had four wheels and not three. However, inasmuch as the motion is grounded upon the insufficiency of the evidence, as well as upon newly discovered evidence, we do not feel warranted in refraining from noticing the character and volume of the evidence proposed to be adduced upon this subject in view of the condition of the record. We shall take for granted what the record shows that the plaintiff testifies directly that the speeder was a three-wheeled speeder. He is corroborated in this testimony by his assistant Zavalney. Now, bearing in mind the importance of Zavalney's testimony as corroborating that of the plaintiff, we shall note particularly its unsatisfactory character, using as a basis for our comment not only his testimony but his statement taken soon after the accident and which was offered in support of the motion for a new trial. On cross-examination Zavalney said, when asked if the car had four wheels: "I said it was three, it seems to me three," and again, "No, it seems to me it had three wheels." When asked if that was his best recollection, he said: "It had three wheels as much as I remember." In his statement which was offered in support of the motion for a new trial, he stated the facts with reference to going to the Soo freight house and taking the part of the car containing the engine and the two large wheels for the purpose of repairing the same; and when asked what parts he left behind he answers: "Just the small wheels." He testifies that when they returned with the part of the car which they had taken to try it out on the track they took from the freight house "Two wheels and certain other parts, the names of which I do not know" belonging to the other half of the car. The number of wheels referred to in Zavalney's statement was not specifically suggested by any question, but purports to spring from his recollection, then fresh, as descriptive of the instrumentality. This statement purports to have been signed by the witness only a few days after the accident. Considering the radical difference in design between a three-wheeled and a four-wheeled speeder, it is difficult to see how eye-witnesses, particularly those handling such instrumentalities for the first time, would differ in their impressions as to whether a given speeder had four wheels or three wheels. It is of course conceivable that a witness might be mistaken, but it is *Page 917 
hardly to be expected that two witnesses would make the same mistake. If Kutchera's testimony is correct in this regard, — and we do not intimate an opinion one way or the other —, it would seem that Zavalney, instead of weakly testifying to his impression, would have an equally vivid impression. Yet, on the other hand, it is difficult to see how Zavalney could, at the time of the trial, have the impression that the speeder had three wheels when shortly after the accident and before the number of wheels had become a controverted or important fact, he had stated that it had four.
There is no merit in the contention of the plaintiff, that it was the duty of Birdsell to warn the plaintiff, that there was danger in operating the machine, Birdsell employed the defendant to repair the engine, and he could not anticipate the use of the car on the tracks by the plaintiff.
Thus far we all agree, and a majority of the members of this court are of the opinion, that there should be a new trial. It is my personal opinion, that the action should be dismissed. We cannot overlook the defense that the plaintiff's injuries were not caused by any neglect on the part of the defendant, or its servants, but was caused and directly contributed to, by the neglect and want of ordinary care on the part of the plaintiff.
The question of contributory negligence which will defeat a recovery has often been before this court, and it is the settled law of this state, supported by the great weight of authority; "That to constitute contributory negligence as a matter of law, the facts and circumstances must be such that no other inference can fairly and reasonably be drawn therefrom." Haugo v. Great Northern R. Co. 27 N.D. 268, 145 N.W. 1053; Christopherson v. Minneapolis, St. P. S. Ste. M.R. Co. 28 N.D. 128, L.R.A. 1915A, 761, 147 N.W. 791, Ann. Cas. 1916E, 683; Crowson v. Minneapolis, St. P. S. Ste. M.R. Co. 36 N.D. 100, 161 N.W. 725; State ex rel. North Dakota Workmen's Comp. Bd. v. Great Northern R. Co. ante, 400, 209 N.W. 553.
It is clear from the plaintiff's testimony that the car was not a dangerous instrumentality when received by the plaintiff. It had been taken apart by Birdsell, the gasoline taken out, and that part containing the engine, was all that was necessary, and all that was taken, by the plaintiff to his shop. The plaintiff looked it over, put gasoline in *Page 918 
it, started the engine and says: "We couldn't hardly decide the trouble of it. We decided we ought to try it out on the track." Without consulting anyone he loaded the part of the car he had at the shop back on the truck, took it to the Soo depot and says, the agent gave him permission to use the track. The conversation at the depot could not have taken over a minute, perhaps not that long. It was so short a time that Zavalney did not even come inside. Thompson did not have much time to think about the train and the tracks and he was assured that it would only take 10 or 15 minutes, or at the most a half hour. Plaintiff went to the warehouse and got the rest of the car and he and Zavalney put it together. Neither of them had ever put together, nor operated that kind of a car. They knew nothing about the alignment of the wheels, and did not know the front end from the back end. They did not replace the brace block which Birdsell had removed, and while running out and back Zavalney was leaning over adjusting the carburetor, and the car was not operated in the usual manner.
If the car was a three wheel speeder, any prudent person would know, that with the weight all on one side and a goodly portion of that weight leaning over adjusting the carburetor, that the small light wheel on the other rail would be over balanced, and the car would leave the track, especially when going around a curve, as they were at the time of the accident.
If the car became a dangerous instrumentality it was made such by the act of the plaintiff in going outside of his instructions and attempting to put together and operate a car which neither he, or his men knew anything about. From the testimony of the plaintiff and his employee there was such a want of ordinary care on the part of the plaintiff in putting the machine together and operating the same as he did, that reasonable minds cannot differ in the conclusion that the negligence of the plaintiff precludes a recovery.
However, since a majority of the members of this court are of the opinion, that the evidence does not show the proximate cause of the accident, and that the evidence on the question of whether the car in question was a three, or four wheeled speeder is so unsatisfactory, that a new trial should be granted on both grounds.
The judgment of the lower court is reversed and a new trial ordered. *Page 919 
CHRISTIANSON, Ch. J., and BIRDZELL, JOHNSON, and BUTTZ, Dist. J., concur.
NUESSLE, J., being disqualified, did not participate; BUTTZ, Dist. Judge, sitting in his stead.